**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Nielsen Consumer LLC, | |
| *Plaintiff*, | No. 24 CV 10946 |
| v. | Judge Lindsay C. Jenkins |
| Circana, LLC, | |
| *Defendant*. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Nielsen Consumer LLC ("NielsenIQ") sued Circana, LLC alleging a variety of trademark, trade secret, and breach of contract claims under both federal and state law. [Dkt. 1.][1] Circana moved to dismiss the complaint in its entirety. [Dkt. 19.] For the reasons stated below, Circana's motion is granted in part and denied in part.

## I.   Background[2]

This case centers on a service called "Label Insight" that NielsenIQ acquired through a merger with Label Insight, Inc. in 2021. [Dkt. 1 at ¶4.] More than just acquiring the service, NielsenIQ inherited a contract that Label Insight entered into

---

[1]   Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

[2]   The following factual allegations are taken from NielsenIQ's Complaint [dkt. 1] and are accepted as true for the purposes of the motion. *Smith v. First Hosp. Lab'ys, Inc.*, 77 F.4th 603, 607 (7th Cir. 2023). In setting forth the facts at the pleading stage, the Court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

with Information Resources, Inc., a predecessor of Circana.[3] [*Id.* at ¶¶ 16, 44.] That contract is at the heart of this dispute.

To set the stage, before it was acquired by NielsenIQ, Label Insight, Inc. operated as a data-driven technology platform and service that specialized in collecting, analyzing, and categorizing product data and attributes from food labels and other consumer packaged goods ("CPGs"), such as grocery items that customers frequently buy and use. [*Id.* at ¶¶4, 21.] Label Insight, Inc. used machine learning and data science to analyze the collected data and create detailed product profiles that went beyond what is typically available on a standard product label, such as whether the product is sustainably sourced or free from specific allergens or ingredients. [*Id.* at ¶¶4, 21, 23.][4] This data helps CPG retailers and manufacturers improve product discoverability and maximize revenue by identifying and capitalizing on emerging trends. [*Id.* at ¶22.]

NielsenIQ is a global leader in data analytics for consumer goods companies and retailers, providing the most complete, unbiased view of consumer behavior, globally. [*Id.* at ¶25.] After the merger with Label Insight, Inc. in 2021, NielsenIQ pared Label Insight, Inc.'s product attribution data with its existing global retail measurement system sales data and panel insights to expand on the value and insight offered to its customers—CPG retailers and manufacturers. [*Id.* at ¶26.]

---

[3]    Legal restructuring resulted in Information Resources, Inc. changing its name to Circana in 2023. [*Id.* at ¶16.] For ease of reference, the Court will refer to Information Resources, Inc. as Circana regardless of the timeframe unless otherwise specified.

[4]    Examples include "keto friendly, low sugar," and "cruelty free." [*Id.* at ¶23.]

Circana is one of NielsenIQ's principal competitors in the CPG data and analytics industry. [*Id.* at ¶¶43, 60.] They provide similar but different services to the CPG industry and have common customers. [*Id.* at ¶60.] Circana provides analytic platforms and services related to CPG label data, insights, and attributes. [*Id.* at ¶¶43, 60.] However, according to NielsenIQ, no competitor in the CPG data industry covers the same breadth of CPG label data, information, and insight as it does through the Label Insight platform. [*Id.* at ¶28.]

In 2020, prior to NielsenIQ's acquisition of Label Insight, Inc., Circana entered into a master services agreement ("MSA") with Label Insight, Inc. to be able to access and use some of its data. [*Id.* at 44.] The goal of the MSA was to provide Circana with Label Insight, Inc.'s foundational product attribute data, permit Circana to pair it with its own consumer and sales data, and use the resulting insights to help its customers. [*Id.* at ¶45.]

Beginning on July 1, 2020, and pursuant to the MSA, Label Insight, Inc. provided Circana non-exclusive access to its Label Insight SaaS platform, in addition to the data. [*Id.* at ¶48.] After the merger, NielsenIQ continued to provide Circana with additional data on a "quad weekly cadence" in accordance with the MSA. [*Id.*] The parties to the MSA agreed that it would automatically expire on June 30, 2025, but that either party could terminate early after completion of the third contract year and upon 180-days' notice. [*Id.* at ¶51.]

On December 29, 2022, after NielsenIQ's acquired Label Insight, Inc., it sent Circana a termination notice in accordance with the MSA which became effective on

June 30, 2023. [*Id.* at ¶57.] Once the MSA terminated, Circana ceased payment of fees and royalties under the contract, and NielsenIQ terminated its access to the SaaS platform. [*Id.* at ¶59.]

That brings us to the reason for this lawsuit. Recently, NielsenIQ learned that another company, LiveRamp, is currently offering for sale "Information Resources, Inc. Attribute Audiences Powered by Label Insight." [*Id.* at ¶61.][5] For ease, the Court uses the shorthand "Audiences" for the dataset posted on LiveRamp, though NielsenIQ's complaint is less than clear about what Audiences is. NielsenIQ alleges that Circana (as the successor to Information Resources, Inc.) sold these "Audiences" *to* LiveRamp and continues to sell this information *on* LiveRamp in connection with the Label Insight trademark, infringing on the trademark, misappropriating its trade secrets, and breaching the MSA. [*Id.* at ¶¶62–63.]

Against that backdrop, and as is necessary to resolve Circana's motion to dismiss, the Court recounts facts specific to each of NielsenIQ's claims.

### A. Breach of MSA

The thrust of NielsenIQ's complaint is that Circana listing Audiences "powered by Label Insight" for sale after the termination of the MSA violated the MSA. Because NielsenIQ's rendition of the MSA is vague, the Court relies primarily on the text of the agreement. *See Fin. Fiduciaries, LLC v. Gannett Co.*, 46 F.4th 654, 663 (7th Cir. 2022) (it is permissible to consider documents attached to and referenced in a complaint without converting a motion to dismiss into one for summary judgment).

---

[5] LiveRamp is a data connectivity platform that provides tools for managing and connecting customer data across various marketing and advertising ecosystems. [*Id.* at ¶10.]

Exhibit A to the MSA is referred to as the Statement of Work ("SOW"). It specifies the materials provided to Circana. First, "views." Views is somewhat circularly defined as "proprietary derived attributes and views of such Product Data and Images," [dkt. 1-3 at 6, ¶1.1], which, in turn, is defined as "label, ingredient, allergen, attribute, nutrient value, certification information and other data and images" [dkt. 1-3 at 2]. Views, therefore, are derived from some analysis that Label Insight, Inc. (now, NielsenIQ) performed on product information.

The specific type of views provided pursuant to the SOW are "Standard Views" which "include readily available attributes developed and grouped according to use cases identified by Label Insight." [*Id.* at 6, ¶1.1(a).] In addition to Views, Label Insight, Inc. shared "Conventional Data" and non-exclusive access to the Label Insight SaaS platform. [*Id.* at 6, ¶1.2, 2; dkt. 1 at ¶48.] The SOW refers to the standard views and conventional data collectively as "LI Materials." [Dkt. 1-3 at ¶1.]

The SOW delineates permitted uses of the data and platform. Circana was constrained to only use the SaaS platform "for internal business analysis and evaluation." [Dkt. 1-3 at 7, ¶5.1(a).] The LI Materials came with more specific restrictions. [*Id.* at 7, ¶5.1(b).] Label Insight, Inc. permitted Circana to do the following: (1) "to copy, distribute, display, transmit, modify and prepare derivative works of the LI Materials;" and (2) "to process the LI Materials using [Circana's] proprietary software and data quality control and enhancement processes and to incorporate such Processed Materials into existing and/or newly developed [Circana]

5

Services and provide such … Services to … Clients pursuant to Customer Contracts." [*Id.*]

The MSA explains that "Processed Materials" are LI Materials that "have been manipulated by [Circana] during the Term to the extent that such data is unique (i.e., not immediately identifiable to the original LI Materials) or has been integrated into [Circana's] Services." [*Id.*] Circana "owns all right, title and interest in and to the Processed Materials … subject to the license to LI Materials." [*Id.* at 2, ¶4.]

The SOW also outlines non-permitted uses. Circana was not permitted to (and had to ensure its customers did not) rent, lease, sell, or transfer the SaaS Platform or any of the LI Materials. [*Id.* at 8, ¶5.2.] In short, Circana could not access and then distribute the LI Materials but could transform them into "Processed Materials" and use them in services for their clients.

The parties had certain obligations upon termination of the contract. [Dkt. 1 at ¶52.] First, "except as provided in the SOW, … [Circana's] use of the LI SaaS Platform and LI materials" was required to immediately terminate. [Dkt. 1-3 at 2, ¶2.] Second, Circana was required to permanently delete all LI Materials within seven business days after the termination of the Agreement, "except as necessary to fulfill Customer Contracts" in which case the LI Materials had to be deleted within seven business days after the fulfillment of Customer Contracts. [*Id.*]

After NielsenIQ terminated the contract, it believed Circana was complying with the MSA and not using the Label Insight materials in an impermissible manner. [Dkt. 1 at ¶59.] Since becoming aware of the data posted on LiveRamp, NielsenIQ

believes Circana breached the MSA by not ceasing use of and deleting the Label Insight data. [*Id.* at ¶63.] It alleges that Circana offers for sale and sells NielsenIQ's Label Insight data to LiveRamp and to LiveRamp's retail and manufacturing customers. [*Id.*] As a result, it contends that Circana breached the MSA by failing to delete the data, misappropriating it, and using it beyond the scope permitted in the agreement in competition with NielsenIQ. [*Id.* at ¶161.]

### B. Trade Secret Claims

The Label Insight data offered through the SaaS platform is confidential, secret, and valuable as it provides NielsenIQ with a competitive advantage in the industry. [*Id.* at ¶24, 28–29, 31.]. Consequently, NielsenIQ takes significant steps to protect the data as well as the know-how related to the collection and use of certain components of the data. [*Id.* at ¶¶30, 33.] In addition to restricting access to the data internally, requiring execution of non-disclosure agreements, and keeping the data in a secure location, NielsenIQ also requires third-party licensees to contractually agree to maintain confidentiality. [*Id.* at ¶¶33–34.] As a result of these efforts, the Label Insight data is not publicly available or widely known in the industry. [*Id.* at ¶35.] It derives independent economic value from not being generally known or readily ascertainable. [*Id.* at ¶32.]

In the MSA, Circana acknowledged that Label Insight's data was confidential. [*Id.* at 36; dkt. 1-3 at 3 ("LI Materials are the Confidential Information of Label Insight…").] It also agreed to use a reasonable degree of care to prevent the

unauthorized use, dissemination, or publication of Label Insight's data to unauthorized third parties. [Dkt. 1 at ¶49.]

Since the termination of the MSA, Circana was contractually obligated to cease all use of the trade secret information and delete it. [*Id.* at ¶63.] As noted, the MSA provides that, except as necessary to fulfill Customer Contracts, the LI Materials needed to be deleted within seven days of MSA termination. [Dkt. 1-3 at 2.] NielsenIQ alleges that this never occurred, but instead Circana continues to offer and sell its trade secret information to LiveRamp and its retail and/or manufacturer customers. [Dkt. 1 at ¶63.] According to NielsenIQ, Circana and LiveRamp collaborate to make Circana's data available within LiveRamp's platform. [*Id.* at ¶11.] It alleges both that the Audiences data *uses* Label Insight trade secrets and that the data offered for sale *is* Label Insight data. [*Id.* at ¶¶12–13.] Either way, NielsenIQ alleges such use is unauthorized and constitutes misappropriation of NielsenIQ's trade secrets. [*Id.* at ¶13.]

### C. Trademark Claims

Through its acquisition of Label Insight, Inc., NielsenIQ owns a trademark registered with the U.S. Patent and Trademark Office as ▦ LABELINSIGHT. [*Id.* at ¶6.] In addition, it acquired common law trademark rights in the "LABEL INSIGHT" mark through continuous use in connection with the Label Insight platform and services since at least early 2015. [*Id.*] Over the years, substantial money was spent to market and advertise the Label Insight product in conjunction with the mark such that the mark is a symbol of NielsenIQ and Label Insight, Inc.'s quality, reputation,

and good will. [*Id.* at ¶37.] Retailers and manufacturers throughout the CPG industry have come to associate the Label Insight mark with highly reliable and valuable data provided by Label Insight, Inc.'s (now NielsenIQ's) services and platform. [*Id.* at ¶7.]

Audiences offered for sale on LiveRamp is marketed, advertised, promoted, and sold by Circana in connection with the Label Insight trademark. [*Id.* at ¶12.] NielsenIQ alleges that Circana's use of the mark in this manner trades off goodwill built since early 2015, knowingly infringes on its rights, and presents a threat of customer confusion. [*Id.* at ¶13.] NielsenIQ never authorized Circana to use the Label Insight mark. [*Id.* at ¶¶9, 12; dkt. 1-3.]

Use of the mark this way improperly suggests the continued affiliation between NielsenIQ and Circana's services which harms NielsenIQ's goodwill. [Dkt. 1 at ¶¶68, 70.] Customers expecting to receive the same reliable data and insight they have come to expect from Label Insight products and services will purchase a product that has no affiliation with NielsenIQ and none of the guarantees and reliability. [*Id.* at ¶70.] This risk is increased because, after termination of the MSA, NielsenIQ terminated Circana's access to the Label Insight Saas platform. [*Id.* at ¶70.]

NielsenIQ alleges that Circana's infringing conduct is intentional and has caused substantial harm in numerous ways including monetary damages, harm to customer and industry relationships, as well as to its market share. [*Id.* at ¶¶71, 73, 76.]

## II.    Analysis

In its complaint, NielsenIQ asserts claims for trademark infringement (Counts I-V), trade secret violation (Claims VI-VII), and breach of the MSA (Count VIII). [*Id.* at ¶¶78–163.] Circana moved to dismiss the complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6). [Dkt. 19.]

### A.    Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the plaintiff's claims. The Court takes well-pleaded factual allegations as true and draws reasonable inferences in the plaintiff's favor. *Reardon v. Danley*, 74 F.4th 825, 827 (7th Cir. 2023); *Choice v. Kohn L. Firm, S.C.*, 77 F.4th 636, 638 (7th Cir. 2023). "To survive a motion to dismiss under Rule 12(b)(6), plaintiff's complaint must allege facts which, when taken as true, plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Cochran v. Ill. State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (cleaned up).

### B.    Breach of MSA (Count VIII)

Because understanding the scope of the MSA aids in the resolution of all NielsenIQ's claims, the Court first assesses Circana's arguments in favor of dismissal of Count VIII.

To state a claim for breach of contract under Illinois law, plaintiff must allege the following four elements: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) a breach of contract by the defendant; and (4) resultant injury to the plaintiff." *PNC Bank, Nat'l Ass'n v. Boytor*, 109 F.4th 495, 506

(7th Cir. 2024). In construing contracts under Illinois law, courts "aim to ascertain the parties' intent by first consulting the plain and ordinary meaning of the contract language." *Page v. Alliant Credit Union*, 52 F.4th 340, 346 (7th Cir. 2022) (cleaned up). If the language of the contract is susceptible to more than one meaning, it is ambiguous, and the court can "look to extrinsic evidence to determine the parties' intent." *Baro v. Lake Cnty. Fed. of Teachers Local 504*, 57 F.4th 582, 587 (7th Cir. 2023).

Circana's arguments challenge NielsenIQ's allegations of substantial performance and breach of the contract. [Dkt. 19 at 19–20.] The substantial performance argument is easily disposed of. The complaint alleges numerous times, and in numerous ways, that Label Insight, Inc. entered into the MSA with Circana [dkt. 1 at ¶44], and that, pursuant to the contract and beginning July 1, 2020, Circana received the items described within the MSA—the LI Materials and access to the corresponding SaaS platform [*id.* at ¶¶46, 48]. Once NielsenIQ acquired Label Insight, it continued performance, providing Circana with the same materials described in the MSA including the quad weekly file export. [*Id.* at ¶48.] Once the MSA was terminated in June 2023, Circana ceased payment of fees and royalties and Nielson terminated Circana's access to the SaaS platform [*id.* at ¶¶59, 70].

For purposes of a motion to dismiss, this is sufficient to allege substantial performance. Circana's citation to *Solvay USA v. Cutting Edge Fabrication, Inc.*, 521 F. Supp. 3d 718, 724 (N.D. Ill. 2021), is unavailing. There, the plaintiff merely alleged that it had complied with all contractual requirements without alleging "any facts

that identify what its obligations under the contract were or how it complied with such obligations." *Id*. at 723. Unlike the plaintiff in *Solvay*, NielsenIQ alleged specific facts—not merely blanket assertions or legal conclusions—supporting its claim that it substantially performed under the MSA.

Turning to the breach argument, NielsenIQ points to the post on LiveRamp as evidence that Circana breached the MSA by not ceasing use of and deleting the Label Insight data. [Dkt. 1 at ¶63.] Put another way, it asserts that the fact that Audiences is available on LiveRamp shows that Circana breached the MSA by continuing to use the LI Materials after termination of the MSA and, additionally, breached the MSA by continuing to sell such information. [*Id.* at ¶61.]

NielsenIQ's complaint is not clear about what Audiences is. It alleges both that the data set *uses* Label Insight data and *is* Label Insight data. [*Id.* at ¶¶12–13.] For example, it asserts that "by selling Label Insight data in connection with the LABEL INSIGHT Mark, Circana has also, on information and belief, misappropriated NielsenIQ's trade secrets." [*Id.* at ¶13.]; *see also* ¶63 ("on information and belief, Circana … continues to offer and sell that Label Insight Trade Secret Information … to LiveRamp."); ¶66 ("Circana is knowingly and willfully promoting and selling Label Insight Trade Secret Information.") In other places though, NielsenIQ asks the Court to accept a conflicting inference—that what was offered on LiveRamp was *Circana's data* that "us[ed] the Label Insight Trade Secret Information." [*Id.* at ¶12.]; *see also* ¶75 ("Circana does not have a legitimate reasons

12

or good faith basis to use the LABEL INSIGHT Mark in connection with ***their competing CPG goods and services.***" (emphasis added)).

The Court has no obligation to accept unwarranted factual inferences; that is, those not reasonably drawn from the facts. *Stachowski v. Town of Cicero*, 425 F.3d 1075, 1078 (7th Cir. 2005). So too is the Court free to consider "facts set forth in the complaint that undermine the plaintiff's claim." *Esco v. City of Chicago*, 107 F.4th 673, 678 (7th Cir. 2024).

The claim that Audiences was NielsenIQ's data presents both issues. First, NielsenIQ alleges no factual support for this inference. Although its own allegations suggest that it could have purchased Audiences from LiveRamp and, by doing so, determined what it is, NielsenIQ does not so allege.[6] As a result, NielsenIQ is limited to asserting without support that the Audiences information must be its LI Materials, flying in the face of, among other things, the title of the data set: *"Audiences powered by Label Insight."* (emphasis added). Second, this inference is contradicted by other allegations in the complaint that Audiences was Circana's competing CPG service. [Dkt. 1 at ¶¶12, 75.]

Against the backdrop of the MSA, NielsenIQ's inference appears even more tenuous. In the complaint, NielsenIQ admits that the MSA provided Circana "with access to Label Insight, Inc.'s foundational product attribute data that was then used, on information and belief, by Circana to provide manufacturers and retailers with

---

[6]     "On information and belief, anyone with login credentials to the LiveRamp store can login [sic] and purchase consumer impressions based on the data and attributes offered by Circana and purportedly "Powered by Label Insight[.]" [Dkt. 1 at ¶64.]

insight **when paired with Circana's consumer and/or sales data**." [*Id.* at ¶45 (emphasis added).] The "permitted uses" section of the SOW confirms that Circana was allowed to create "Processed Materials" by processing the LI Materials using its own software and then incorporation the processed materials into its customer services and providing them to its customers. [Dkt. 1-3 at ¶5.1.][7] Without additional facts alleging that Audiences are the raw materials provided pursuant to the MSA, not the service expressly permitted by Section 5.1 of the SOW, NielsenIQ's inference is unsupported. Consequently, it cannot be considered for purpose of resolving Circana's motion to dismiss.

Another inference NielsenIQ asks the Court to accept is that the availability of Audiences on LiveRamp confirms that Circana continued to use the LI Materials *after* the MSA was terminated. Conspicuously absent from the complaint are allegations concerning (1) when NielsenIQ learned of the Audiences offering on LiveRamp, and (2) when Circana made the Audiences information available on LiveRamp, even on information and belief. Without allegations along these lines, the Court has no way of knowing when Circana last used the LI Materials. Built into this unsupported inference is another implicit one: that making Audiences available on LiveRamp constitutes "use" of the LI Materials. But, because the complaint lacks factual detail about *what* Audiences is, it's unsurprising that it's also silent as to how and when LI Materials were used to create Audiences. So, that inference is not warranted either.

---

[7]    Furthermore, the "non-permitted uses" section of the SOW prohibits Circana from selling, sublicensing or otherwise making the LI Materials available. [Id. at ¶5.2(a).]

Ultimately, even accepting that Audiences continued to be available on LiveRamp (or that Circana affirmatively sold Audiences to LiveRamp) after termination of the MSA, the contract does not necessarily prohibit that. While the contract requires both parties to take certain steps upon termination of the contract, they only pertain to the LI Materials and corresponding software. [Dkt. 1-3 at ¶2.] For example, the MSA dictates that "[u]pon termination of this Agreement … [Circana's] use of the LI SaaS Platform and LI materials … will immediately terminate." [*Id.*]

Circana and NielsenIQ make numerous arguments concerning the exceptions provided in paragraph 2 of the MSA, but the problem is more fundamental. Services Circana develops using "Processed Materials" derived from LI Materials are not defined as LI Materials by the MSA. So, the MSA's requirement that Circana terminate use of LI Materials does not mean Circana's use of its existing "Processed Materials" must terminate. In fact, the MSA provides that Circana "owns all right, title and interest in and to the Processed Materials, subject to the license to LI materials granted herein." [*Id.* at ¶4.] Nothing in the agreements more generally undermines the conclusion that the services Circana developed during the term of the MSA using the LI Materials belong to Circana. The upshot is that the contract places no relevant limitations on Circana's continued use of its previously created services—that is, services developed using the LI Materials.[8]

---

[8]     Whether Circana can associate these services with NielsenIQ by way of the phrase "powered by Label Insight" is a separate matter.

Termination of the MSA put the brakes on Circana's continued processing of the LI Materials. [*Id.* at ¶5.1(b).] In this way, Circana was prohibited from using LI Materials to create new "Processed Materials" after the contract terminated. [*Id.*] But, as indicated above, the Complaint does not allege that happened. It does not plausibility allege, for example, that Audiences available on LiveRamp was created using NielsenIQ data after June 30, 2023, as opposed to during the term of the MSA.

Confining its view only to NielsenIQ's plausible factual allegations and ignoring unwarranted factual inferences, the Court agrees that it has failed to state a claim for breach of the MSA. Count VIII is dismissed.

## C.    Trade Secret (Claims VI-VII)

According to NielsenIQ, after termination of the MSA, Circana was required to cease use of the LI "Trade Secret Information."[9] [Dkt. 26 at 17–18.] Instead, Circana misappropriated NielsenIQ's trade secrets by creating Audiences and offering Audiences for sale on LiveRamp. [*Id.*] NielsenIQ alleges that conduct violates the federal Defend Trade Secrets Act ("DTSA") as well as the Illinois analogue, the Illinois Trade Secrets Act ("ITSA"). Since the elements of the two claims are the same, the Court analyzes them together. *Allstate Ins. Co. v. Ameriprise Fin. Servs.*, 2023 WL 5334638, at *11 (N.D. Ill. Aug. 18, 2023).

To state a claim, "a plaintiff must show that (1) a trade secret existed, (2) the trade secret was misappropriated, and (3) the owner of the trade secret was damaged

---

[9]    NielsenIQ refers to the information at issue as "Trade Secret Information" but this is unhelpful. Calling something a trade secret does not make it a trade secret. It also distracts from NielsenIQ responsibility to describe, at least in general terms, what the data is.

16

by the misappropriation." *Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 817 (N.D. Ill. 2014). Circana does not contest damages, so only the first two elements are at issue. [Dkt. 26 at 12.]

If the information is protectable, element two—misappropriation—may be satisfied by alleging that "the disclosure or use of a trade secret [was] without express or implied consent." *Allstate Ins. Co.*, 2023 WL 5334638, at *22 (citation and internal quotation marks omitted). Given that Circana acquired the LI Materials through the MSA, NielsenIQ relies on the improper disclosure theory. [Dkt. 26 at 18.]

### 1.    Existence of a Trade Secret

To show that particular information is a protectable trade secret, a plaintiff must demonstrate that the information is valuable, that it is not known to others who might profit by its use, and that it has been handled by means reasonably designed to maintain secrecy. *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002)).[10]

While existence of a trade secret is ordinarily a question of fact, to withstand a motion to dismiss the complaint must "identify the alleged trade secret in a general sense," *Smietana v. Stephens*, 2023 WL 3737720, at *11 (N.D. Ill. May 30, 2023). It is insufficient for a plaintiff "to point to broad areas of technology and assert that something there must have been secret and misappropriated." *Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp. 3d 915, 921 (N.D. Ill. 2016) (cleaned up). On

---

[10]    Although *IDX* involved a claim for misappropriation of a trade secret under Wisconsin law, the statute at issue was materially identical to the ITSA, "and federal courts have properly cited *IDX* in applying Illinois trade secret law." *REXA, Inc. v. Chester*, 42 F.4th 652, 663 n.2 (7th Cir. 2022).

the other end of the spectrum, however, requiring detailed "public disclosure of the purported trade secrets" in a complaint would exacerbate plaintiff's troubles and potentially defeat its claim. *Id.* The middle ground is that the plaintiff must generally state the type of trade secret material in question. *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1065 (N.D. Ill. 2020) (holding plaintiff adequately identified its trade secrets by alleging that they consisted of "information about its customers, such as their purchase histories and preferences, as well as [its] internal pricing and costing processes.")

"Both the DTSA and ITSA require a plaintiff to take reasonable efforts to secure and maintain the secrecy of alleged trade secrets." *Sonrai Sys., LLC v. Waste Connections, Inc.*, 658 F. Supp. 3d 604, 615 (N.D. Ill. 2023). At the motion to dismiss stage, plaintiff need only allege "that it employed reasonable confidentiality measures to protect its alleged trade secrets[.]" *Id.* at 616; *see also Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 818 (N.D. Ill. 2014) (plaintiff must allege the "efforts to maintain [the trade secret's] confidentiality … in general terms"). Where a plaintiff alleges "specific efforts it has taken to protect the business information," that is sufficient to withstand a motion to dismiss. *Covenant Aviation Sec., LLC*, 15 F. Supp. 3d at 818.

Circana attacks NielsenIQ's complaint on both fronts. [Dkt. 19 at 15–16.] But NielsenIQ alleges the LI data is valuable and provides it a competitive advantage. [Dkt. 1 at ¶¶28-29.] It also alleges that it takes reasonable steps to preserve the confidentiality of the information, detailing some of the processes it employs

including both internally and externally when licensing the data to third parties like Circana. [*Id.* at ¶¶33–34.] [*Id.* at ¶34.]

"[D]etermining the reasonableness of a given confidentiality measure requires a fact-based inquiry dependent on the specific circumstances." *Sonrai Sys., LLC*, 658 F. Supp. 3d at 615. As a result, only in "extreme case[s] can … reasonable precaution[s] be determined as a matter of law." *Id.* Here, the Court finds that NielsenIQ's allegations are sufficient. *Sonrai Sys., LLC*, 658 F. Supp. 3d at 615; *Aspen Mktg. Servs., Inc. v. Russell*, 2009 WL 4674061, at *8 (N.D. Ill. Dec. 3, 2009) (finding similar steps sufficient at the motion to dismiss stage). NielsenIQ maintains its data is confidential, that the confidentially of the data contributes to its corporate success, and, therefore, it takes steps to preserve its confidentially. For now, that is plenty.

The closer question is what trade secrets are at issue. NielsenIQ explains in its response brief that its trade secrets are "the data Circana received under the [MSA], as well as the know-how related to the collection and use of that data." [Dkt. 26 at 13.] In its complaint, though, NielsenIQ claims that "Label Insight data" is aggregated "product attribution data" [*id.* at ¶26] that has been "compiled, sorted and coded" by Label Insight and NielsenIQ [*id.* at ¶28]. As for the subset of data specifically licensed to Circana via the MSA, that includes "label, ingredient, allergen, attribute, nutrient value certification information and other data and images compiled and analyzed by Label Insight … as well as further propriety derived attributes and views of such product data." [*Id.* at ¶44.][11]

---

[11]    The SOW appears to include additional information concerning the data set, but the version filed with the Court is redacted. [Dkt. 1-3 at 6, ¶4.]

NielsenIQ has not adequately described its trade secrets. Missing from its claim is a plain language explanation of what "proprietary derived attributes and views of", "label, ingredient, allergen, attribute", and "nutrient value certification information" are. [Dkt. 1 at ¶44.] These categories of information are inscrutable to a person outside NielsenIQ and Circana's industry. *See REXA, Inc.*, 42 F.4th at 663 ("When a plaintiff presents complex or detailed descriptions of methods and processes but fails to isolate the aspects that are unknown to the trade, no trade secret has been identified."). "[J]udges are generalists." *Consolidation Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 732 F.3d 723, 728 n.1 (7th Cir. 2013). NielsenIQ's decision to "lard[] [its] briefs" with undefined "industry-specific jargon" defeats its claim. *Id.*

Comparison with other cases where plaintiffs sufficiently described their trade secrets illuminates the deficiencies here. For example, in *Fire 'Em Up, Inc. v. Technocarb Equip. (2004) Ltd.*, the court found plaintiff's allegations sufficient where it described its trade secrets as including current and prospective customer lists, lists of current and prospective suppliers, "combinations or compilations of materials necessary to create [certain products and services]," and marketing plans and advertising strategies. 799 F. Supp. 2d 846, 850 (N.D. Ill. 2011). In another case where the trade secret claim arose from a working relationship gone wrong, the court found plaintiff's description sufficient where it explained its confidential information included "a method for collecting standardized data," "software design specifications," and "impact reports and analytics." *Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp. 3d 915, 921–22 (N.D. Ill. 2016). In *Sonrai Systems* the court found

plaintiff's allegations sufficient where they explained, in broad terms, what the trade secret was and what it did: "'event validation systems … [that] establish[] a computer based visual confirmation that the waste hauling service has been completed." 658 F. Supp. 3d at 614.

In contrast, NielsenIQ's complaint provides no guidance as to what "derived attributes" are and how they work. Such "blanket generalizations" are insufficient as a matter of law and leave Circana—and the Court—in the dark about the type of data is at issue. *Thermal Zone Prods. Corp. v. Echo Eng'g, Ltd.*, No. 93 C 0556, 1993 WL 358148, at *5 (N.D. Ill. Sept. 14, 1993) (dismissing trade secret claim where plaintiffs merely alleged that their trade secrets consisted of "over 3000 pages of technical information, including drawings, plans, and specifications"). Similar to the plaintiff in *Thermal Zone Products*, NielsenIQ's allegations do not identify "concrete secrets" or "direct[] [the Court] as to how [its] information is unique and protected." *Id.* While courts infrequently dismiss complaints on this basis, this is an "extreme case[]" where dismissal is warranted. *Fire 'Em Up, Inc.*, 799 F. Supp. 2d at 850; *AutoMed Techs., Inc. v. Eller*, 160 F. Supp. 915, 921 n.3 (N.D. Ill. 2001)

## 2. Misappropriation

Even if NielsenIQ adequately identified its trade secrets, to state a claim it must sufficiently allege that Circana misappropriated a trade secret by using it without express or implied consent. *Packaging Corp. of Am., Inc.*, 419 F. Supp. 3d at 1066; *Allstate Ins. Co.*, 2023 WL 5334638, at *22.

Here, the misappropriation analysis tracks the breach of contract analysis. *Sonrai Sys., LLC*, 658 F. Supp. 3d at 616 ("[T]he statutes acknowledge that what begins as permissive use may become misappropriation."). The MSA governs the working relationship between NielsenIQ and Circana with respect to the trade secrets. As a result, to allege misappropriation, NielsenIQ must allege breach of the MSA—that is, allege that the MSA prohibits (or does not permit) what Circana did. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d at 573 ("[M]isappropriation of a trade secret normally is not actionable without either a tort or a breach of contract[.]" (quoting *ConFold Pac., Inc. v. Polaris Indus., Inc.*, 433 F.3d 952, 959 (7th Cir. 2006))).

According to NielsenIQ, this element is met through its allegations that Circana used its trade secrets to create Audiences or, alternatively, that Audiences is its trade secrets. [Dkt. 26 at 18.] These are substantively the same arguments made with respect to the breach of MSA claim, so the two claims rise and fall together. *Morris Silverman Mgmt. Corp. v. W. Union Fin. Servs., Inc.*, 284 F. Supp. 2d 964, 992 (N.D. Ill. 2003) (finding that conduct that "did not breach the parties' contract … cannot constitute misappropriation under ITSA" because "the contract defines th[e] duty for purposes of misappropriation").

Because NielsenIQ's allegations were insufficient to state a claim for breach of contract, they are also insufficient to maintain a claim that Circana misappropriated any trade secrets. As explained above, NielsenIQ failed to adequately allege that Audiences *are* its trade secrets. Furthermore, making and selling Audiences *using*

22

NielsenIQ's trade secrets is permissible under the MSA. [Dkt. 1-3 at ¶5.1(b).] NielsenIQ also insufficiently alleged that Circana continued to "use" its trade secrets to create new or updated Audiences after termination of the MSA. So, any trade secret claim on that basis fails as well. As for allegations that Circana has continued to sell (and offer for sale) Audiences on LiveRamp after termination of the MSA, any trade secret claim on that basis fails too. The MSA does not put a time limit on Circana's ability to sell products or services it previously created using NielsenIQ's trade secrets. So, that conduct does not constitute misappropriation either.[12]

NielsenIQ's complaint falls short of adequately describing its trade secrets and plausibly alleging that Circana's use of the trade secret information constituted misappropriation in light of the MSA. So, NielsenIQ's trade secret claims must be dismissed.

### D. Trademark Infringement (Claims I-V)

Last up are NielsenIQ's trademark claims brought under the Lanham Act, Illinois law and common law. While they have different titles (trademark infringement, unfair competition, and deceptive practices), they share the same core elements and can be analyzed together for purposes of resolving this motion to dismiss. *See Top Tobacco v. Fantasia Distribution Inc.*, 101 F. Supp. 3d 783, 788 (N.D. Ill. 2015).

---

[12] Circana harps on the lack of detail in NielsenIQ's complaint about who Circana allegedly disclosed trade secrets to. Fair point. NielsenIQ alleges both initial disclosure to LiveRamp through a sale and continued disclosure as LiveRamp's customers were able to purchase the Audiences product. For purposes of the Motion to Dismiss, though, it does not matter to whom Audiences was disclosed because the MSA broadly permits Circana "or its affiliates" to sell the processed data. [Dkt. 1-3 at ¶5.1(b).]

Two trademarks are at issue. First, is the registered trademark for ⬛ LABEL**INSIGHT**. [Dkt. 1 at ¶6.] Second, is the common law mark in "LABEL INSIGHT" which NielsenIQ claims has been in continuous use since use in connection with the Label Insight platform and services since at least early 2015. [*Id.*] NielsenIQ discusses both marks together in its complaint and alleges that Circana infringed on both. [*Id.*][13]

"[T]o succeed on a trademark infringement claim, the claimant must show that it owns a valid, protectable trademark and that there is a likelihood of confusion caused by the alleged infringer's use of the disputed mark." *Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 844 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 2630 (2024).

At the motion to dismiss stage, though, courts frequently decline to delve into these issues, finding they are factual issues best resolved at the summary judgment stage. *See Slep-Tone Ent. Corp. v. Coyne*, 41 F. Supp. 3d 707, 715 (N.D. Ill. 2014) (limiting itself to "assessing whether [plaintiff] has pleaded facts that plausibly could results in a successful outcome on the likelihood of confusion element of its claim");

---

[13]     Circana argues that NielsenIQ's trademark claims should be dismissed because of its failure to allege that "Circana affirmatively used the 'Label Insight' mark." [Dkt. 19 at 11.] The Court disagrees. NielsenIQ alleges that Circana knowingly and willfully promotes and sells Audiences in connection with NielsenIQ's trademarks to LiveRamp and its customers. [Dkt. 1 at ¶¶62, 66.]; *Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 767 (N.D. Ill. 2008) (declining to resolve use issue at motion to dismiss). While these allegations are on information and belief, doing so is not per se impermissible. *Vance v. Bureau of Collection Recovery LLC*, 2011 WL 881550, at *3 (N.D. Ill. Mar. 11, 2011) (collecting cases). Especially since this subject is "peculiarly within the knowledge of the defendant[]," the Court finds the allegations sufficient to support NielsenIQ's claim that Circana used the marks in question. *Huon v. Denton*, 841 F.3d 733, 743 (7th Cir. 2016); *see also Brown v. Budz*, 398 F.3d 904, 914 (7th Cir. 2005) (holding that in such cases "conclusory pleading on 'information and belief' should be liberally viewed").

*Vulcan Golf, LLC*, 552 F. Supp. 2d 752, 766 (N.D. Ill. 2008) (declining to assess whether trademark was protectable at the motion to dismiss stage); *Educ. Tours, Inc. v. Hemisphere Travel, Inc.*, 2004 WL 887417, at *2 (N.D. Ill. Apr. 26, 2004) (finding defendants' argument that the trademark in question was generic "inappropriate at th[e] [motion to dismiss] stage of the litigation").

Because protectability and likelihood of confusion are questions of fact, *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 300 (7th Cir.1998), *overruled in part*, *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001); *Vulcan Golf, LLC*, 552 F. Supp. 2d at 769, the Court finds this course of action prudent and declines to resolve these issues at the dismissal stage. Instead, the Court reviews whether NielsenIQ adequately alleged both elements of a trademark infringement claim. *WorkForce Software, LLC v. Workforce.com, Inc.*, 2021 WL 4963608, at *8 (N.D. Ill. Oct. 26, 2021).

### 1. Protectability

On the protectability element, where a registered trademark is at issue, registration is *prima facie* evidence of the mark's validity, and "the owner's exclusive right to use the registered mark." *KJ Korea, Inc. v. Health Korea, Inc.*, 66 F. Supp. 3d 1005, 1013 (N.D. Ill. 2014); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 14 (2d Cir. 1976). The presumption may be overcome "with evidence that the mark is generic or descriptive, or that it lacks secondary meaning." *Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 854 (N.D. Ill. 2018), *aff'd*, 926 F.3d 409 (7th Cir. 2019). For unregistered or "common law" trademarks, the plaintiff must "show[] that

the mark is protectable based on the degree of its distinctiveness." *KJ Korea, Inc.*, 66 F. Supp. 3d at 1013. Essentially, the same distinctiveness inquiry applies, but the burden is on the plaintiff to establish the protectability of their common law mark. *C.f. Uncommon, LLC*, 305 F. Supp. 3d at 854.

"Courts classify marks into five categories of increasing distinctiveness: (i) generic; (ii) descriptive; (iii) suggestive; (iv) arbitrary; and (v) fanciful." *Id.* Marks that are generic are not afforded trademark protection at all, "while … descriptive marks only receive[] trademark protection 'if [they] acquire[] secondary meaning in the collective consciousness of the relevant community.'" *Id.* (quoting *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 727 (7th Cir. 1998)). A generic mark "is commonly used and does not identify any particular source" of the product, *KJ Korea, Inc.*, 66 F. Supp. 3d at 1014, but rather the type, kind, genus or subcategory of goods, *Henri's Food Prods. Co. v. Tasty Snacks, Inc.*, 817 F.2d 1303, 1305–06 (7th Cir. 1987). Examples include "wine," *United States Pat. & Trademark Office. v. Booking.com B. V.*, 591 U.S. 549, 554 (2020), "lite," in reference to light beer, *Henri's Food Prods. Co.*, 817 F.2d at 1306, and "beef stick," *Hickory Farms, Inc. v. Snackmasters, Inc.*, 500 F. Supp. 2d 789, 795 (N.D. Ill. 2007).

One ratchet up in distinctiveness, "a descriptive mark describes the ingredients, qualities, or characteristics of an article of trade or a service." *KJ Korea, Inc.*, 66 F. Supp. 3d at 1014 (citation and internal quotation marks omitted); *SportFuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 599 (7th Cir. 2019) ("A mark is descriptive when it describes the product category to which the brand belongs."

(citation and internal quotation marks omitted)). Examples include "Sports Fuel," *KJ Korea, Inc.*, 66 F. Supp. 3d at 1014, "tasty," with respect to salad dressing, *Henri's Food Prods. Co.*, 817 F.2d at 1306, and "inhibitor" with respect to WD–40, *Sorensen v. WD-40 Co.*, 792 F.3d 712, 724 (7th Cir. 2015).

Turning to the categories of marks "automatically entitled to trademark protection," *Platinum Home Mortg. Corp.*, 149 F.3d at 727, "[s]uggestive ('Tide' laundry detergent), arbitrary ('Apple' computers), and fanciful ('Exxon' gasoline) marks collectively are distinctive in the sense that secondary meaning is likely to develop," *Bliss Salon Day Spa v. Bliss World LLC*, 268 F.3d 494, 496–97 (7th Cir. 2001).

Circana argues both of NielsenIQ's marks are generic, and, thus unprotectable, or, at most, descriptive, and unprotectable by virtue of NielsenIQ's failure to allege that the mark acquired secondary meaning. [Dkt. 19 at 9–10.][14]

NielsenIQ alleges that its trademarks signify a service that does more than provide product attributes (that is, insights into labels); it helps retailers and manufacturers market their products more precisely by allowing them to understand what consumers are looking for and how to capitalize on market segments where supply does not match demand. [Dkt. 1 at ¶¶23, 27.] It contends that its marks have also developed secondary meaning "in the collective consciousness of the relevant

---

[14]    In making this argument, Circana relies on facts outside of the complaint to claim that the mark is a design mark, not a word mark. [Dkt. 19 at 9.] It is not clear to the Court that the mark type is relevant at this stage of the analysis; Circana points to no case establishing that it is. Regardless, though, this fact is outside the bounds of the complaint. Even if it were susceptible to judicial notice, Circana has not asked the Court to take that step, and it declines to.

community." *Platinum Home Mortg. Corp.*, 149 F.3d at 727. Specifically, NielsenIQ alleges that retailers and manufacturers associate the mark with the Label Insight services and platform as a result of its extensive advertising and promotion efforts. [Dkt. 1 at ¶¶4, 41.] In that way, the marks have become distinctive and identify "genuine Label Insight goods and services." [*Id.* at ¶42.] At this stage, these allegations are sufficient to establish that NielsenIQ's trademarks are, at minimum, descriptive and have acquired secondary meaning.

### 2.     Likelihood of Confusion

The Seventh Circuit uses a seven-factor test to assess likelihood of consumer confusion:

> (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) intent of the defendant to "palm off" his product as that of another.

*Packman v. Chicago Trib. Co.*, 267 F.3d 628, 643 (7th Cir. 2001). At the motion to dismiss stage, the complaint need not allege facts supporting each element. *KJ Korea, Inc.*, 66 F. Supp. 3d at 1015. The Court views the factual allegations together to determine whether they "raise the possibility of relief above the speculative level." *Id.* (citation and internal quotation marks omitted).

As for the first factor, the similarity of the marks, NielsenIQ alleges that Circana used its common law mark, LABEL INSIGHT, in connection with the sale of Audiences on LiveRamp. [Dkt. 1 at ¶6.] It does not address the differences between its registered trademark,  LABEL**INSIGHT** and Circana's alleged use of the words

28

"powered by Label Insight." For example, none of NielsenIQ's allegations suggest that Circana used the small design of stacked black boxes that appears on the left hand side of the mark. The allegations also indicate that Circana added space between the words "label" and "insight" and didn't bold the word "insight" as appears in the registered mark. Nevertheless, the Court concludes that NielsenIQ's allegations are sufficient on the issue of similarity. Because NielsenIQ has alleged that Circana used its exact common law mark, and because the common law mark is quite similar to the registered mark, at the motion to dismiss stage, NielsenIQ has done enough to allege similarity.

Moving to the second factor, NielsenIQ alleged that the CPG data and analytic services Circana offers (using the Label Insight data and mark) compete with NielsenIQ's own services. [Dkt. 1 at ¶¶74, 94.] That supports the conclusion that "the products are the kind the public attributes to a single source." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 899 (7th Cir. 2001). NielsenIQ's assertion is bolstered by other allegations in the complaint, discussed below, regarding the competitive nature of NielsenIQ and Circana's products.

NielsenIQ does not make any explicit argument with respect to factors three, four, five or six, but the complaint reveals some allegations that fit the bill. For example, NielsenIQ alleged, as is relevant for factor three, that it and Circana "have many common customers, as it is not unusual for CPG manufacturers and/or retailers to license both parties' products and solutions." [*Id.* at ¶60.] That allegation supports the existence of a "relationship in use, promotion, distribution, or sales between the

goods or services of the parties" because the parties' products, in at least some cases, directly compete and are sold to the same types of consumers. *Ty, Inc.*, 237 F.3d at 899.

"The sixth and seventh factors of the likelihood of confusion analysis are whether there is actual confusion between the marks and products at issue, and whether the Defendant intended to 'palm off' its own product as Plaintiffs'." *Top Tobacco*, 101 F. Supp. 3d at 791. NielsenIQ alleged that, on information and belief, Circana's conduct "already has caused[] confusion, mistake, or deception among consumers." [*Id.* at ¶95.] As the *Slep-Tone* court recognized, even assuming CPG manufacturers and retailers are sophisticated customers, given what NielsenIQ alleged concerning the "close relationship between the parties' products and services, and the fact that they operate within the same industry," the complaint suggests the potential for customer confusion. 41 F. Supp. 3d at 716. That leads into the final factor. NielsenIQ argues that Circana intentionally used the mark to confuse customers into believing the Audiences product was validly associated with NielsenIQ. [*Id.* at ¶96.] In light of NielsenIQ's allegations that Circana was not authorized to use its trademark [*id.* at ¶¶9, 12; dkt. 1-3] and continued to market Audiences in conjunction with the trademark even after termination of the MSA, [*id.* at ¶63], it has done enough to plausibly assert that Circana intended to "palm off" Audiences as validly associated with NielsenIQ. *Top Tobacco*, 101 F. Supp. 3d at 791.

Circana argues that NielsenIQ's allegations of customer confusion are implausible because it was truthfully crediting the source of its data in Audiences.

[Dkt. 27 at 9.] What NielsenIQ is complaining of, according to Circana, is alleged customer confusion over whether LiveRamp was authorized to use Label Insight data, not customer confusion over the data source. [*Id.*]

To begin, confusion regarding the sponsorship or approval of products sold in the marketplace is a type of confusion the Lanham Act aims to prevent. *Fortres Grand Corp. v. Warner Bros. Ent. Inc.*, 763 F.3d 696, 701 (7th Cir. 2014) ("[O]nly confusion about 'origin, *sponsorship, or approval* … of goods' supports a trademark claim." (emphasis added)); *AutoZone, Inc. v. Strick*, 543 F.3d 923, 930 (7th Cir. 2008) ("The test is … whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected." (cleaned up)). That is why courts apply a presumption of confusion where "a licensee continues to use marks owned by the licensor after termination of the license." *All Star Championship Racing, Inc. v. O'Reilly Auto. Stores, Inc.*, 940 F. Supp. 2d 850, 860 (C.D. Ill. 2013) (collecting cases). While the presumption does not apply here, since the MSA didn't give Circana the right to use NielsenIQ's marks, the principle behind the presumption does: a trademark claim lies where use of a trademark presents a likelihood of confusion concerning the affiliation of the product with the trademark owner. *See, e.g.*, *AutoZone, Inc.*, 543 F.3d at 930 ("The court should therefore consider whether the customer would believe that the trademark owner sponsored, endorsed or was otherwise affiliated with the product." (citing *Nike, Inc. v. "Just Did It" Enters.*, 6 F.3d 1225, 1228–29 (7th Cir.1993))).

31

Circana's citation to *Hebrew University of Jerusalem v. DealzEpic*, 2022 WL 3026934, at *2 (N.D. Ill. Aug. 1, 2022), suggests that it is seeking to invoke a fair use defense that permits "the descriptive use of otherwise trademarked language" "only to describe the goods and services" being offered. *Id.*; *see also SportFuel, Inc.*, 932 F.3d at 595. To successfully invoke the fair use defense, Circana must show that (1) it did not use "Label Insight" as a trademark; (2) the use is descriptive of its goods; and (3) "it used the mark fairly and in good faith." *SportFuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 595 (7th Cir. 2019). Even if Circana adequately raised the defense in its briefs, *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022) ("perfunctory and undeveloped arguments" are waived), the Court declines to resolve application of the fair use defense—a form of affirmative defense—at this juncture. *C.f. Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (explaining that "these defenses typically turn on facts not before the court at [the motion to dismiss] stage"). The facts necessary to determine application of the three factors outlined above are not currently before the Court. [Dkt. 1-3 at ¶4.]

In sum, NielsenIQ "need not prove [its] case at this point in time, [it] need only adequately plead sufficient facts such that [its] claim is 'plausible' and puts the defendant[] on notice of the claims against them such that the defendants can respond." *Vulcan Golf, LLC*, 552 F. Supp. 2d at 769. Considering all NielsenIQ's allegations directed at the likelihood of confusion analysis, the Court believes its claim is plausible.

### III.    Conclusion

For the reasons stated above, Circana's motion to dismiss [Dkt. 19] is granted in part and denied in part. NielsenIQ's trade secret and breach of contract claims (Counts VI-VIII) are dismissed without prejudice. The motion is otherwise denied.

Enter:25 CV 10946
Date:  March13, 2025

_____
Lindsay C. Jenkins
United States District Judge