**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NIELSEN CONSUMER LLC; | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  24-CV-10946 |
| v. | ) | |
| | ) | Judge Lindsay C. Jenkins |
| CIRCANA, LLC; | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) | |

**FIRST AMENDED COMPLAINT**

1.      Plaintiff Nielsen Consumer LLC d/b/a NielsenIQ ("NielsenIQ"), by and through its attorneys, hereby submits its First Amended Complaint against Defendant Circana, LLC ("Circana") for infringement of the LABEL INSIGHT Mark, breach of contract, misappropriation of the highly-proprietary and valuable Label Insight Trade Secret Information, and other acts of unlawful competition, which have caused (and continue to cause) NielsenIQ significant damages and irreparable harm for which there is no adequate remedy at law. In support, NielsenIQ provides the following statement of the grounds and claims asserted.

**Nature of Action**

2.      Consumers are no longer shopping only based on brand, flavor, or price. They are also making purchasing decisions based on specific attributes (*i.e.*, characteristics) of the products. For example, shoppers are now seeking out sustainability-minded products, "clean-label" products, products that fit the particular lifestyle they lead (*e.g.*, organic, vegan, keto, pescatarian, kosher, etc.), products free from certain allergens and intolerances (*e.g.,* gluten free, lactose free, shellfish free, nut free, etc.), products that promote particular health claims (*e.g.,* probiotics, joint health, heart health, digestive health, energy, etc.), products that contain (or do not contain) particular ingredient qualities (*e.g.*, trans fat, high fructose corn syrup, artificial color, etc.), and

products with certain certifications (*e.g.,* American Vegetarian, Vegan Friendly, Vegan Certified, Cruelty Free, Dolphin Safe, etc.). Therefore, from keto-friendly snacks and gluten-free beer, to biodegradable shampoos and paraben-free makeup, the shopping experience is now more personalized than ever.

3.      Yet many products provide only a limited set of attributes/characteristics on their label/packaging, for example, what is legally required to be presented (ingredients and nutritional facts). And even those items can be difficult to understand. As a result, consumers, retailers, and/or product manufacturers may not be aware that a product meets one or more of the most-searched or valuable attributes consumers seek in that type of product. This means retailers and manufactures may be missing out on potential sales and leaving money on the table because they often lack insight into a full or complete view of consumer buying habits and interests (not just what consumers are buying from them, but what they are buying from others and why they are buying it).  These insights into the fast-moving consumer goods industry principally originate from one of two sources in the United States, NielsenIQ and Circana. With knowledge of consumer interests and what is in, or how a product is created, retailers and product manufacturers can highlight particular product attributes and then target specific audiences of consumers that have expressed interest in that particular attribute with advertising and marketing for products containing those attributes. This targeted advertising and marketing approach focuses on the audiences of customers most likely to purchase the products based on particular attributes.

<u>"Audiences" Help Companies Target Consumers for their Product Advertising</u>

4.      Customers that share similar interests or purchasing habits are often referred to by companies and marketing agencies as consumer "audiences." According to Circana's website, marketers understand how important it is to get the audiences for their brand and products right.

That's why they spend so much time creating personas, perfecting their creative messaging, and segmenting the market. But it's during the next step after segmentation—the details of media ***audience creation and selection***—where Circana claims marketers often struggle to realize campaign effectiveness.[1] (emphasis added).

5.      According to Circana, audiences can be grouped based on several different factors. For example, audiences can be based on consumer demographics (*e.g.*, age, gender or race), but demographic-based audiences and targeting, according to Circana, can cast a wide net and amount to a "spray and pray" approach. Another method is based on contextual factors (*e.g.*, website and search history), which helps companies and marketing agencies target people who follow websites and blogs on topics relevant to its products, but according to Circana, it is not accurate enough to identify the products people are most likely to buy. *Id.* The same can be said of targeting behavioral audiences, according to Circana. *Id.* Just because a person likes dog photos on social media does not mean they are a good target for pet products. *Id.*

6.      Therefore, according to Circana, the most accurate type of audience for consumer targeting are audiences built using actual purchasing data to determine who is actually purchasing particular products. *Id.* Indeed, Circana also states on its website that "[u]ltimately, consumers are what they buy—not how old they are, which sites they browse, or which posts they like. For this reason, it's essential to make scalable, consented purchase data the foundation of [a company's] audience-targeting efforts." *Id.* This purchasing information is obtained by Circana through, on information and belief, at the very least, loyalty card data programs, including Circana's exclusive access to Kroger and Walgreens loyalty card data. *Id.*

---

[1] *See* https://www.circana.com/intelligence/blog/2023/how-to-create-more-precise-accurate-audiences-for-your-media-campaigns/.

7.     But knowing which products consumers have purchased does not, in and of itself, necessarily make it possible for companies to target consumers—or audiences of consumers—based on particular product attributes those consumers may value (as opposed to simply the particular products themselves). For example, just because a customer has previously purchased a product in the past that happened to be "cruelty-free" does not mean that the customer necessarily values that particular attribute. The customer could have purchased the product for countless different reasons/attributes. Therefore, if a company were looking to tout the "cruelty-free" nature of its new product through its advertising, targeting a consumer that previously purchased a product that just happened to be "cruelty-free" may have little (if any) impact on that consumer's future purchasing decision. But carefully targeting audiences of consumers that have routinely purchased products that meet the "cruelty-free" attribute criteria, is likely to help make the advertising more effective for the company or advertising agency.

8.     In order to create audiences based on specific product attributes, however, purchasing data alone is typically insufficient. Purchasing data must be paired with detailed product data and information—and the attributes applicable to each product—to determine which products contain and/or satisfy a particular attribute and then determine which customers have historically purchased products with those attributes. The Venn diagram below is meant to help demonstrate how audiences based on particular product attributes are created at a general level.



9.     For example, by cross referencing customer purchasing data for all products with product attribute data filtered for a particular product attribute (*e.g.*, "organic" foods), companies like Circana can identify current customers that may be more likely to purchase "organic" products and can then license those audiences to manufactures of organic products so they can more effectively target their marketing and advertising to those customers or "audience."

10.     These audiences are then are typically refreshed on an ongoing basis using various data inputs to ensure that the audiences are still accurately targeting current consumers and their current purchasing habits. For example, a consumer that was previously vegan in 2023 and purchased numerous products identified by the "vegan" attribute, may no longer be vegan in 2025. Therefore, targeting that individual with advertisements for vegan-based products in 2025 may be waste of money and time.

11.     Simply stated, an "audience" is a snapshot of a group of individuals based on data available at that time that is commonly refreshed. And each time the "audience" is refreshed, a new "audience" of individuals is created. To create and refresh an "audience," one needs to use various data inputs, such as the purchase data of a particular group, as well as the specific characteristics/attributes of distinct products purchased by that group.

12.     Ultimately, by obtaining data on what particular product attributes customers within particular audiences value, retailers and manufacturers can improve product discoverability, deliver experiences that meet shoppers' needs, maximize revenue by identifying emerging trends and capitalizing on those trends, and more accurately target their marketing and advertising to those customers who—based on their historical purchasing habits—may be more likely to be impacted by the marketing and advertising of a particular product attribute.

<u>Label Insight Provides In-Depth Understanding of Product Attributes</u>

13.     That is where the Label Insight product, its underlying product attribute data and information, and its related services, come in. Label Insight is a data-driven technology platform and service—originally developed and owned by Label Insight, Inc. in St. Louis, Missouri—that specializes in collecting, analyzing, and categorizing product attribute data and information (*e.g.*, ingredient, allergen, nutrient value, certification information, etc.) from hundreds of thousands of food labels and other consumer packaged goods (a/k/a CPGs). Label Insight uses proprietary machine learning and data science to help analyze the data gathered from those product labels and then designates which product attributes—out of the tens of thousands of attributes developed by Label Insight—apply to each particular product. In doing so, Label Insight helps retailers and manufacturers determine the "why" behind the consumers' "buy," by providing a detailed understanding of the product attributes associated with each product.

14.     The tens of thousands of product attributes identified by Label Insight are then grouped (*i.e.* categorized) into particular related categories, otherwise referred to by Label Insight at times as "views." For example, product attributes like lactose-free, gluten-free or dairy-free may be grouped into an "Allergens & Intolerances" view.

15.     Some product attributes may be listed on the product label itself, but are still analyzed and categorized by Label Insight to provide enhanced value for its customers. However, many attributes that Label Insight assigns to a particular product have to be derived from careful inspection and analysis of the particular product's ingredients and characteristics, as well as an in-depth understanding of those ingredients and the particular classifications, regulations and certifications, allergens, etc. that may apply.

16.     For example, just because a particular product does not explicitly state on its label that it is Vegan, does not necessarily mean it is not Vegan. Label Insight therefore carefully analyzes the product's ingredients to determine whether it believes the product does or does not qualify as a Vegan product. If it does, Label Insight assigns that "derived" attribute to the product. On the other hand, if a product label claims the product is Vegan, Label Insight analyzes the product's ingredients and other characteristics to determine if it believes that purported attribute truly applies. If not, Label Insight will not designate Vegan as a derived attribute for that particular product. Therefore, "derived attributes" are the attributes Label Insight assigns to each product based on its own proprietary and holistic analysis of the product as a whole in addition to the attributes obtained and categorized from the product packaging and labels themselves.

17.     The identification and categorization of derived attributes helps identify significantly more products that qualify for a particular attribute beyond what may be identified in the product name or on the product packaging. For example, roughly speaking, derived attributes can help identify nearly 700% more products with a "Low Sodium" attribute, where product title may only indicate 275 products as a product with the "Low Sodium" attribute and product packaging may only indicate 11,278 products as a product with the "Low Sodium" attribute. But by using derived attributes created by, and proprietary to, Label Insight, nearly 100,000 products can be identified as actually having the "Low Sodium" attribute—even if not indicated expressly on the product packaging.

18.     On information and belief, the Label Insight platform now provides the industry's most granular and enriched product attributes, with over 27,000 attributes per product that go far beyond the label and 99% coverage of all consumer queries related to those products (*i.e.*, coverage of the attributes Label Insight believes consumers are commonly searching for). As a result, on

information and belief, Label Insight has become the industry's most trusted source of product attribute data and the largest product attribute metadata platform globally. This data, when paired with consumer purchasing data, can then be used to create, among other things, "audiences" to help companies more effectively target their marketing and advertising.

19.     In addition to creating audiences for targeted advertising, the product attribute data offered through the Label Insight platform can also help retailers and consumers identify, through various retail data and analytics services, among other things, how many consumers are searching for a particular product attribute, which customers and/or customer demographics are purchasing products with that particular product attribute, how many products in the market fail to claim that particular product attribute, the total annual sales related to that particular product attribute, and the percentage of sales growth from the prior year, as shown by the example below.



Label Insight + NielsenIQ Provides 360 Degree Insight
Food & Beverage

| 2.9M Annual Searches | 899K Annual Searches | 6.7M Annual Searches | 379K Annual Searches | 38K Annual Searches |
|---|---|---|---|---|
| 61K Unclaimed Products | 127K Unclaimed Products | 88K Unclaimed Products | 138K Unclaimed Products | 238K Unclaimed Products |
| $69.94B Dollar Sales | $88.58B Dollar Sales | $77.96B Dollar Sales | $163.46B Dollar Sales | $248.33B Dollar Sales |
| KETO Ketogenic | Low Sodium | V Vegan | No Added Sugar | Soy Free |
| 7.0% Dollar Growth | 6.1% Dollar Growth | 5.9% Dollar Growth | 6.1% Dollar Growth | 6.0% Dollar Growth |

20.     The highly-proprietary and valuable Label Insight platform and services described above, and further below, have been used continuously in connection with the LABEL INSIGHT trademark since at least as early as 2015. Beyond its common law trademark rights in the LABEL INSIGHT trademark, NielsenIQ also owns, through its acquisition of Label Insight, Inc., a federal registration from the United States Patent and Trademark Office ("USPTO") for

**LABELINSIGHT** (Reg. No. 5055429) in connection with *"[p]roviding product data collection and management services for use in food product label analysis and marketing; providing product data solutions and analytics, namely, analyzing and compiling collected business data for food product labeling; business data analysis, namely, providing product data for analysis for food product label marketing and sales"* (IC 035) (the "Registered LABEL INSIGHT Mark"). *See* Exhibit 1 (copy of the Certificate of Registration for Reg. No. 5055429). NielsenIQ's common-law and registered trademark rights in the LABEL INSIGHT trademark are collectively referred to herein as "LABEL INSIGHT Mark."

21.     As a result, NielsenIQ believes that retailers and manufacturers throughout the consumer packaged goods, or CPGs, industry have come to associate the LABEL INSIGHT Mark with the highly-reliable and valuable product attribute data provided through the Label Insight services and platform—providing tremendous value to NielsenIQ and embodying the significant goodwill of the company.

<u>Circana Previously Licensed Product Attribute Data from Label Insight</u>

22.     In 2021, Label Insight, Inc., including all of its assets and rights, was acquired by NielsenIQ, a global leader in data analytics, to further enhance product transparency solutions within the retail and consumer packaged goods sectors. The acquisition helped expand Label Insight's reach by integrating it with NielsenIQ's global data network of consumer purchasing information and providing detailed purchasing analytics based on particular product attributes.

23.     Prior to NielsenIQ's acquisition, Circana had previously licensed the product attribute data and information described above and further below from Label Insight, Inc., and subsequently NielsenIQ, through a Master Services Agreement, which was executed in July of 2020.

- 9 -

24.     As defined further below, the product-related data and information provided to Circana under the Master Services Agreement and accompanying Statements of Work—as further defined and described in detail throughout the attached Master Services Agreement, the July 2020 Statement of Work, and the September 2020 Statement of Work—including, the aggregated and detailed product attribute data for hundreds of thousands of consumer packaged goods that Circana was licensed and received under the Master Services Agreement, as well as NielsenIQ's proprietary list of tens of thousands of product attributes and the categories of those attributes (*i.e.*, views), and the general know-how related to the development of the Label Insight Materials provided to Circana under the Master Services Agreement and accompanying Statements of Work, is collectively referred to herein as "Label Insight Trade Secret Information."

25.     In connection with the Master Services Agreement, Circana entered into two statements of work to use the licensed product attribute data and information for two distinct and limited types of services. The first being market measurement services offered by Circana. And the second being to sell services related to "audiences" created using the product attribute data and information licensed from Label Insight, Inc., and subsequently NielsenIQ, under the Master Services Agreement. Specifically, Circana used the product attribute data and information licensed by Label Insight, Inc., and subsequently NielsenIQ, to filter its own internal data and create target "audiences" for advertisers to purchase and use in marketing campaigns. *See, e.g.,* ECF 19 at p. 1 (admitting Circana used the Label Insight data to filter its own internal data in order to create target "audiences" for advertisers to purchase and use in marketing campaigns). The Venn Diagram below is meant to help illustrate how Circana would, on information and belief, use the data and information licensed under the Master Services Agreement, when paired with its own product sales data, to create audiences at a fundamental and basic level.



26.     After NielsenIQ's acquisition of Label Insight, Inc., NielsenIQ provided Circana with written notice on December 29, 2022 that the Master Services Agreement would be terminated on June 30, 2023. As a result, the Master Services Agreement and accompanying statements of work were officially terminated on June 30, 2023.

27.     Upon termination, all of Circana's rights, licenses, consents and authorizations were immediately terminated unless expressly provided otherwise through the single limited exception outlined in the related statements of work. While the rights that were terminated included Circana's continued use of the actual Label Insight data and information licensed under the Master Services Agreement, that is not where Circana's terminated rights ended. And while Circana was obligated to return or destroy the actual product attribute data and information licensed under the Master Services Agreement upon termination, that does not mean Circana was able to freely continue using materials that had been created previously using the licensed product attribute data and information. Circana's right to use those processed materials came with numerous limitations—both before and after termination of the Master Services Agreement.

28.     For instance, upon termination of the Master Services Agreement, Circana was prohibited from, among other things, continuing to license and/or sell any audiences, or any other materials and/or services, that Circana had previously created using the product attribute data and information licensed under the Master Services Agreement unless such continued use after

termination fell within very narrow exceptions provided under the statements of work, which are not applicable here for the reasons discussed further below.

29.     Specifically, and as addressed in detail below, under both statements of work under the Master Services Agreement, Circana was permitted (*i.e.*, licensed) to provide services to its clients that utilized processed materials created using the data and information licensed under the Master Services Agreement. Circana's right to provide those services, however, was limited to the term of the Master Services Agreement and subject to specific royalty payment obligations. Therefore, the Master Services Agreement and its accompanying statements of work explicitly placed limitations on Circana's right to use previously created services and/or materials developed using the Label Insight data and information licensed under the Master Services Agreement after termination of the Master Services Agreement, including, without limitation audiences created by Circana using the licensed data. It also prohibited Circana from continuing to use the product attribute data and information licensed under the Master Services Agreement after termination to create or refresh any materials, including audiences.

<u>Circana's Continued use of Label Insight Data after Termination</u>

30.     Despite the Master Services Agreement being terminated over a year earlier on June 30, 2023, NielsenIQ discovered in 2024 that LiveRamp Holdings, Inc. and LiveRamp, Inc. (collectively "LiveRamp") were continuing to offer for purchase by anyone with a LiveRamp account "Attribute Audiences" purportedly acquired from Circana (fka IRI + NPD) in connection with the LABEL INSIGHT Mark, including, but not necessarily limited to, as shown below.



31.     Audiences, like the one shown above, can be activated (*i.e.*, licensed) by companies and marketing agencies through companies like Circana, or its various partners, such as LiveRamp. By activating the audiences, the company and/or marketing agency's advertisement or marketing campaign is disseminated across various platforms like Facebook, Instagram, Twitter, etc. and targeted to individuals in the particular audience selected. In doing so, companies and marketing agencies purchase what are called "impressions," which are the number of times the company and/or marketing agency's advertisement is viewed by a person within the selected audience. For example, if a company is looking to advertise to individuals that have recently purchased "organic labeled products," they setup an advertising campaign that defines their budget and the "Audience" they want to spend money targeting (*e.g.*, Organic Food Buyers). The company's advertisement for its organic food product would then be targeted to individuals in that audience based on the particular media channels selected (*e.g.*, Facebook) and each time the advertisement is seen by an individual within that audience, such as on the individual's Facebook page, it would count as one of the impressions purchased by the company.

32.     On information and belief, LiveRamp is a data connectivity platform that provides tools for managing and connecting customer data (*e.g.*, advertisements) across various marketing

and advertising ecosystems. LiveRamp therefore serves as a hub for data connectivity, offering services that allow brands, publishers, and agencies to connect their first-party data with third-party data sources (*e.g.,* Circana audiences) and activate it across various channels and platforms. Essentially, LiveRamp offers products and/or data from third-party data companies, such as audiences from Circana, and then pays that third-party data company for use of their data.

33.     According to LiveRamp's website (https://liveramp.com/customer-stories/circana-testimonial/), Circana and LiveRamp collaborate to make Circana's deterministic data (*e.g.*, audiences) available within LiveRamp's data platform. This collaboration expanded, on information    and    belief,    in    2023    (https://www.circana.com/intelligence/press-releases/2023/circana-partners-with-snowflake-and-liveramp-to-support-seamless-and-private-data-collaboration-for-advertisers/) to provide greater access to Circana's purchase-based data for particular product attributes and directly distribute advertisements and/or marketing materials to audience segments created using Label Insight data. Circana specifically identified LiveRamp on its own website as one of its 20+ partners where companies can activate Circana's audiences. *See https://www.circana.com/solutions/complete-audiences/.*

34.     The audience shown above, on information and belief, and based on the fact that its listing claims that the "organic" product attributes used to create the "Attribute Audiences" were tracked by Label Insight, was one of the audiences created by Circana using product attribute data and information previously licensed under the Master Services Agreement. Yet despite termination of the Master Services Agreement on June 30, 2023, and termination of Circana's right to use the previously licensed Label Insight data and information or continue selling the audiences created using the previously licensed Label Insight data and information, Circana offered, at the very least, the audience shown above for sale through, at the very least, LiveRamp.

35. To confirm Circana's audiences, including the one shown above, were still available for purchase after termination of the Master Services Agreement, NielsenIQ had a small number of impressions of the "Organic Food Buyers" audience shown above and listed through LiveRamp purchased in or around September of 2024. That purchase was successful and over 1,900 impressions were run on the Circana audience.

36. Therefore, on information and belief, the audience offered by LiveRamp under "**IRI Attribute Audiences Powered by Label Insight**," as shown above, was marketed, advertised, promoted and sold by Circana to, at the very least, LiveRamp and its customers in connection with the LABEL INSIGHT Mark and, on information and belief, was built and refreshed using the Label Insight Trade Secret Information as defined further below.

37. On information and belief, the audience shown above is just one example of the numerous audiences created and refreshed by Circana using Label Insight data and information that was still available for purchase from Circana, or one of its partners, after termination of the Master Services Agreement. Audiences can either be offered publicly, like the one shown above, or customized for particular customers, which would not be evident through public audience listings on LiveRamp. In fact, based on representations previously provided by Circana, prior to termination of the Master Services Agreement on June 30, 2023 Circana had sold dozens of different audiences prior to June of 2023 that were created using Label Insight product attribute data and information, with hundreds of millions of impressions sold during that period alone.

38. NielsenIQ has never provided LiveRamp with authorization to use the LABEL INSIGHT Mark or its highly-proprietary data related to CPG product attributes in connection with goods and/or services offered for sale and/or license by Circana, or on behalf of Circana. And ever since the Master Services Agreement was terminated on June 30, 2023, Circana has not been

- 15 -

authorized to use the licensed Label Insight data and information in any manner—including, without limitation, by disclosing, marketing, or selling any materials that were created using the Label Insight data and information, such as audiences, to LiveRamp or any new customers, unless meeting a narrow exception that does not, on information and belief, apply in this case—or to use the LABEL INSIGHT Mark in connection with competing CPG attribute data and analytic services, and related goods/services, such as the sale of audiences.

39.     Circana's unauthorized use of the LABEL INSIGHT Mark in connection with the sale of its services to consumers, including, without limitation, LiveRamp, trades off the goodwill built in the LABEL INSIGHT Mark since at least as early as 2015, knowingly infringes NielsenIQ's well-established and indisputable rights in the LABEL INSIGHT Mark, and presents a significant threat to the public's interest in not being confused when making purchasing decisions. And by purportedly selling audiences created using Label Insight data licensed under the Master Services Agreement in connection with the LABEL INSIGHT Mark, Circana has also, on information and belief, misappropriated NielsenIQ's Label Insight trade secrets by, at the very least, using its trade secrets in connection with those audiences, or, alternatively, disclosing or using goods and/or services created using NielsenIQ's Label Insight trade secrets, without express or implied consent while, at the time of the disclosure or use, knowing or having reason to know, at the very least, that knowledge of the trade secret was derived under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret, or was derived from or through a party who owed a duty to NielsenIQ to maintain the secrecy of the trade secret or limit the use of the trade secret.

40.     Therefore, through this Complaint, NielsenIQ seeks to protect its rights in the LABEL INSIGHT Mark and its Label Insight Trade Secret Information by, among other things,

obtaining injunctive relief, damages, and disgorgement of Circana's unjust enrichment, in an amount to be specifically determined at trial, for Circana's unfair competition and infringement of the LABEL INSIGHT Mark in violation of the Lanham Act (15 U.S.C. § 1114 and 1125) and state infringement/unfair competition laws, misappropriation of NielsenIQ's trade secrets in violation of the Defend Trade Secrets Act (18 U.S.C. § 1831 et seq.) ("DTSA") and state misappropriation laws, as well as breach of the Master Services Agreement.

**The Parties**

41.     Plaintiff Nielsen Consumer LLC ("NielsenIQ") is a Delaware limited liability company with a principal place of business at 200 W. Jackson Blvd., Chicago, IL 60606. NielsenIQ acquired Label Insight, Inc., along with all of its assets and rights, in May 2021. In August 2021, Label Insight, Inc. merged with and into NielsenIQ, with NielsenIQ being the surviving entity following the merger.

42.     On information and belief, Defendant Circana, LLC is a Delaware limited liability company with a principal place of business at 203 North LaSalle Street, Chicago, IL 60601 and has marketed, advertised, promoted and sold goods and/or services in Illinois in connection with the LABEL INSIGHT Mark and using (or created using) the Label Insight Trade Secret Information. On information and belief, Circana, LLC is the successor in interest to Circana, Inc. and Information Resources, Inc. as a result of legal restructuring and name changes and, therefore, is subject, by operation of law, agreement, or otherwise, to all assets, rights, liabilities and obligations of Circana, Inc. and Information Resources, Inc. Specifically, Information Resources, Inc. legally changed its name to Circana, Inc. in 2023 and then Circana, Inc. was converted to Circana, LLC subsequently the same year. Unless specified herein, the term Circana shall relate to

actions taken by Circana, LLC and/or its predecessor entities Circana, Inc. and Information Resources, Inc.

**Jurisdiction and Venue**

43.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 pursuant to NielsenIQ's allegations of trademark infringement under the Lanham Act (15 U.S.C. §§ 1114 and 1125) and trade secret misappropriation under the federal Defend Trade Secrets Act (18 U.S.C. § 1831 et seq.).   This Court also has supplemental jurisdiction over NielsenIQ's state law and common law claims pursuant to 28 U.S.C. § 1367(a) because they are so substantially related and share a common nucleus of operative facts with NielsenIQ's federal claims as to form part of the same case or controversy.

44.     This Court has personal jurisdiction over Circana, and such an assertion is in accordance with the Due Process clause of the Fourteenth Amendment of the United States Constitution, because Circana is headquartered in Illinois at 203 North LaSalle Street, Chicago, IL 60601 and has committed tortious acts in Illinois giving rise to and/or related to the claims asserted herein, including, without limitation, and on information and belief, its unauthorized use of the LABEL INSIGHT Mark in connection with the sale of CPG data and information (*e.g.,* audiences) in Illinois and its unauthorized disclosure and/or use of the Label Insight Trade Secret Information in Illinois, including, at the very least, disclosure and/or use of audiences created using the Label Insight Trade Secret Information. Furthermore, through the Master Services Agreement, as further described below, Circana irrevocably submitted to personal jurisdiction in the courts located in Chicago, Illinois.

45.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because, on information and belief, a substantial part of the events or omissions giving rise to the claims

asserted in the Complaint occurred in this judicial district, including, without limitation, the fact that Circana is headquartered in this judicial district and therefore conducted its unauthorized use of the LABEL INSIGHT Mark in connection with the sale of CPG data and information in this judicial district and, on information and belief, disclosed and/or used the Label Insight Trade Secret Information in this judicial district, including, at the very least, through disclosure and/or use of audiences created using the Label Insight Trade Secret Information, and a substantial part of the property that is the subject of this action is situated in this judicial district. Venue is also proper in this judicial district under 28 U.S.C. § 1391(b)(1) because, on information and belief, the defendant resides in Illinois. Finally, through the Master Services Agreement, as further described below, Circana irrevocably submitted to venue in the courts located in Chicago, Illinois.

<u>**Facts Common to All Counts**</u>

**I.     Label Insight Business, Trade Secret Information, and Trademark Rights**

46.     Label Insight, a product and service offered and sold by NielsenIQ, provides CPG manufacturers and retailers with data and tools related to tens of thousands of product attributes for hundreds of thousands of consumer-packaged goods that help them understand consumer behavior in their markets and use that knowledge to grow their business. In doing so, Label Insight provides retailers and manufacturers with insight into the "why" behind consumers' "buy."

47.     Label Insight is a data-driven technology platform and service that specializes in collecting, analyzing, and categorizing product data and attributes (*e.g.*, ingredient, allergen, nutrient value, certification information, etc.) from hundreds of thousands of food labels and other consumer-packaged goods. Consumer-packaged goods (a/k/a "CPGs") are products that consumers frequently use and replenish (*i.e.*, repeatedly purchase on a frequent basis), including,

for example, grocery items (*e.g.*, produce, meat, seafood, dairy, etc.), household care items, pet supplies, and health or beauty items.

48.     Label Insight uses proprietary machine learning and data science to help analyze the data gathered from those hundreds of thousands of product labels and then designates which product attributes—out of the tens of thousands of attributes developed and categorized by Label Insight—apply to each particular product. While some of these product attributes are listed on the product label itself, and are analyzed and categorized accordingly, many of the attributes that Label Insight assigns to a particular product have to be derived from careful inspection and analysis of the product's particular ingredients and characteristics, as well as an in-depth understanding of those ingredients and which particular classifications, allergens, regulations and certifications, etc. may apply.

49.     Label Insight then creates detailed product profiles for each product that go well beyond what's typically available on a standard product label by compiling, sorting, and coding the data. This data is then used to help retailers and manufacturers improve product discoverability, deliver experiences that meet shoppers' particular needs, and maximize revenue by identifying emerging trends and then capitalizing on those trends.

50.     Label Insight, on information and belief, has become the industry's most trusted source of product attribute data for CPGs and the largest product attribute metadata platform globally. With a market-leading database of hundreds of thousands of product nutrients, hundreds of thousands of product ingredients, and millions of product claims, Label Insight's premier product metadata platform—which spans numerous consumer product preferences, such as sustainably sourced, free from specific allergens or ingredients, keto friendly, low sugar, cruelty

free, etc.—enables brands and retailers help shoppers find the products that meet their individual health, wellness, and lifestyle needs (*i.e.*, the attributes they value most).

51. The confidentiality and secrecy of the aggregated data compiled, sorted, and coded by NielsenIQ, and formerly Label Insight, Inc., and offered through the Label Insight platform, provides it with significant independent economic and competitive value. In fact, in 2020, Label Insight was named to the CB Insights 2020 Retail Tech 100, as one of the world's most innovative B2B retail technology companies.

52. In May 2021, Label Insight, Inc. was acquired by NielsenIQ, a global leader in data analytics, to further enhance product transparency solutions within the retail and consumer packaged goods sectors. NielsenIQ is the leader in providing the most complete, unbiased view of consumer behavior, globally. Powered by a ground-breaking consumer data platform and fueled by rich analytic capabilities, NielsenIQ enables bold, confident decision-making for the world's leading consumer goods companies and retailers.

53. The acquisition in 2021 helped pair Label Insight's significant wealth of product attribute data with NielsenIQ's gold-standard, global retail measurement system ("RMS") sales data and panel insights in order to further expand Label Insight's reach and, in turn, the value and insight offered to CPG retailers and manufacturers from the product attribute data.

54. NielsenIQ's Label Insight platform and services now provide the industry's most granular and enriched product attributes, with over 27,000 attributes per product that go far beyond the label and a nearly complete coverage of consumer queries related to those products (*i.e.*, coverage of the attributes that consumers are commonly searching for). This data, when paired with consumer purchasing data, can then be used to create valuable audiences to help companies more effectively target their marketing and advertising to consumers. This data also helps retailers

and manufactures identify, among other things, how many consumers are searching for a particular attribute, how many products in the market fail to claim that attribute, the total annual sales related to that attribute, and the percentage of sales growth related to that attribute from the prior year, as shown by the examples below. These tailored Label Insight solutions enable retailers and manufacturers to then thrive amid rapidly changing consumer preferences, digital disruption and new competitors.



Label Insight + NielsenIQ Provides 360 Degree Insight
Food & Beverage

| 2.9M Annual Searches | 899K Annual Searches | 6.7M Annual Searches | 379K Annual Searches | 38K Annual Searches |
|---|---|---|---|---|
| 61K Unclaimed Products | 127K Unclaimed Products | 88K Unclaimed Products | 138K Unclaimed Products | 238K Unclaimed Products |
| $69.94B Dollar Sales | $88.58B Dollar Sales | $77.96B Dollar Sales | $163.46B Dollar Sales | $248.33B Dollar Sales |
| KETO Ketogenic | Low Sodium | V Vegan | No Added Sugar | Soy Free |
| 7.0% Dollar Growth | 6.1% Dollar Growth | 5.9% Dollar Growth | 6.1% Dollar Growth | 6.0% Dollar Growth |

55.     Therefore, the confidential and proprietary data and information compiled, sorted and coded as part of the Label Insight services, particularly the breadth of product attribute data and information compiled by Label Insight, is extremely sensitive and valuable in the consumer data industry and is precisely how Label Insight differentiates itself from competitors. NielsenIQ is not aware of any competitor in the CPG data industry that covers the same breadth of CPG product attribute data, information and insight as provided through the Label Insight proprietary offering.

   a.   NielsenIQ considers the Label Insight data for hundreds of thousands of products, including the attributes assigned to each of those products, to be its trade secret.

56.     The confidentiality and secrecy of the detailed and robust Label Insight data for hundreds of thousands of products provides NielsenIQ with a significant competitive advantage in

the industry. This is, in part, because data assessment and analysis can only be as good as the data collected. If the data has gaps, inaccuracies, biases, or is not large enough to read trends from, analyzing and commercializing the data is of limited value. NielsenIQ is uniquely positioned to address those issues given its preexisting expertise and robust Label Insight data.

57. NielsenIQ therefore regards the Label Insight Trade Secret Information, as further described and defined below, as highly confidential, proprietary, and trade secret, and carefully protects this material and know-how, as further described below.

58. The Label Insight Trade Secret Information is of immense value to NielsenIQ's business, is the result of substantial investment and effort by NielsenIQ, and formerly Label Insight, Inc., and forms the foundation for Label Insight having a competitive advantage in the CPG data and analytics industry. On information and belief, this is among the most confidential, proprietary, and trade secret information in the consumer data industry.

59. The Label Insight Trade Secret Information derives independent economic value from not being generally known, and not being readily ascertainable through proper means by another person who could obtain economic value from the acquisition, disclosure, or use of the information because industry competitors differentiate themselves by offering unique data products and services—which depends on the collection of unique data and information that is proprietary and confidential to each industry competitor.

60. NielsenIQ takes reasonable steps to protect the confidentiality and secrecy of the Label Insight Trade Secret Information and independent economic value derived therefrom. By way of example, but not an exhaustive list, NielsenIQ restricts access to the Label Insight Trade Secret Information to personnel on a need-to-know basis, keeps highly sensitive information in a secure location, and stores confidential information on secured and password-protected computer

systems. NielsenIQ also requires its employees to execute non-disclosure agreements as a prerequisite to employment and their receipt of the Label Insight Trade Secret Information. On information and belief, Label Insight, Inc, prior to its acquisition in 2021, took similarly reasonable steps to protect the confidentiality and secrecy of the Label Insight Trade Secret Information and independent economic value derived therefrom.

61. For any of the Label Insight Trade Secret Information licensed to a third party, NielsenIQ requires the third party to contractually agree to maintain the confidentiality and secrecy of the Label Insight Trade Secret Information and limit its use of such information.

62. The Label Insight Trade Secret Information is not susceptible to reverse engineering and is not, as a result of NielsenIQ's, and formerly Label Insight, Inc.'s, reasonable efforts to maintain its secrecy, publicly available or widely known in the industry. As a result, the Label Insight Trade Secret Information derives independent economic value from not being generally known to, and not readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

63. Circana acknowledged as much through the Master Services Agreement by, as further discussed below, agreeing that the Label Insight Trade Secret Information was the confidential information of Label Insight, Inc., and that Label Insight, Inc. owns all intellectual property rights related to that information.

   b. The LABEL INSIGHT Mark has been used in connection with the Label Insight platform and services since at least 2015.

64. The LABEL INSIGHT Mark has been used continuously in connection with the highly-proprietary and valuable Label Insight platform and services described above since at least as early as 2015. As a result of its longstanding use, and the substantial money spent in marketing and advertising throughout the years in connection with the LABEL INSIGHT Mark, the LABEL

INSIGHT Mark has come to serve as symbol and assurance of NielsenIQ and Label Insight's quality, reputation, and goodwill.

65.    To further protect its common law trademark rights in the LABEL INSIGHT Mark, NielsenIQ also owns, through its acquisition of Label Insight, Inc., a federal trademark registration from the United States Patent and Trademark Office for ▦ L A B E L **I N S I G H T** (Reg. No. 5055429) in connection with *"[p]roviding product data collection and management services for use in food product label analysis and marketing; providing product data solutions and analytics, namely, analyzing and compiling collected business data for food product labeling; business data analysis, namely, providing product data for analysis for food product label marketing and sales"* (IC 035) ("Registered LABEL INSIGHT Mark"). *See* Exhibit 1 (Reg. No. 5055429). The Label Insight registration is valid, subsisting, unrevoked, and has not been cancelled.

66.    Pursuant to 15 U.S.C. §§ 1115 and 1057, the federal registration for the Registered LABEL INSIGHT Mark is *prima facie* evidence of the validity of the Registered LABEL INSIGHT Mark, as well as NielsenIQ's ownership and exclusive right to use said mark in connection with the goods and services identified in the registration certificate, namely, *product data collection and management services for use in food product label analysis and marketing; providing product data solutions and analytics, namely, analyzing and compiling collected business data for food product labeling; business data analysis, namely, providing product data for analysis for food product label marketing and sales.*

67.    Through the merger on August 30, 2021, NielsenIQ acquired all right title and interest in and to the U.S. Trademark Registration No. 5,055,429, as well as all common law trademark rights in the LABEL INSIGHT Mark, together with the goodwill of the Label Insight, Inc. business connected with and symbolized by the LABEL INSIGHT Mark. *See* Exhibit 2.

68.     Through extensive advertising and promotion, as well as the exceptional and reliable services offered in connection with the LABEL INSIGHT Mark since at least as early as 2015, the LABEL INSIGHT Mark has, on information and belief, earned substantial fame and considerable goodwill among the public and is a critical factor to NielsenIQ's business success in the competitive market of CPG data and insight.

69.     In short, the LABEL INSIGHT Mark is a distinctive asset of immeasurable value and identifier of genuine Label Insight goods and services. The goodwill symbolized by the LABEL INSIGHT Mark belongs exclusively to NielsenIQ and dates back to at least as early as 2015, long before Circana began its unauthorized use of marks identical or substantially similar to the LABEL INSIGHT Mark.

## II.   Circana's Relationship with Label Insight, Inc (and subsequently NielsenIQ), its Contractual Obligations under the Master Services Agreement, and Access to Label Insight Trade Secret Information.

70.     Circana is one of NielsenIQ's primary competitors in the CPG data and analytics industry and provides numerous competing services, including, without limitation, data and analytic platforms and services related to CPG label data, insights, and attributes that compete with the Label Insight product offering.

71.     Prior to NielsenIQ's acquisition of Label Insight, Inc. in 2021, Circana, through its predecessor entity, Information Resources, Inc., entered into a Master Services Agreement with Label Insight, Inc. in July of 2020 to acquire, among other things, label, ingredient, allergen, attribute, nutrient value, certification information and other data and images compiled, analyzed, and categorized by Label Insight, Inc., as well as further proprietary derived attributes and views of such product data—collectively defined under the Master Services Agreement as "LI Materials" and referred to herein as "Label Insight Materials." *See* Exhibit 3 (Master Services Agreement).

72.     Through the Master Services Agreement, Circana was provided with access to Label Insight, Inc.'s foundational product attribute data that was then used, on information and belief, by Circana to provide manufactures and retailers with insight and analytics, either through: (i) Circana's market measurement services, consumer/shopper and media measurement services and other services provided by Circana pursuant to which it collects data from retailers, processes such data and provides data and analytics to clients, or (ii) Circana's media analytics services, including audiences created by Circana and used by Circana's clients to target their advertisements to particular customers and for activation across digital, TV and mobile platforms.

73.     In connection with the Master Services Agreement, Circana entered into two statements of work which, in addition to the Master Services Agreement itself, outlined the data licensed to Circana, Circana's permitted uses of the licensed data (as well as non-permitted uses), and Circana's obligations upon termination of the Master Services Agreement.

74.     The Master Services Agreement, which included the first Statement of Work as Exhibit A (referred to herein as the "July 2020 Statement of Work") is attached hereto as Exhibit 3 and the second Statement of Work (referred to herein as the "September 2020 Statement of Work") is attached hereto as Exhibit 4.[2] The July 2020 Statement of Work and the September 2020 Statement of Work shall collectively be referred to herein as "Statements of Work." Unless specified otherwise, the term "Master Services Agreement" includes the Master Services Agreement and all accompany Statements of Work entered pursuant to that agreement.

---

[2] NielsenIQ is filing redacted copies of Exhibit 3 and Exhibit 4 with its publicly available First Amended Complaint to protect its proprietary attributes and views from public disclosure. As was done with NielsenIQ's original Complaint (ECF 6 and 7), NielsenIQ will separately file a Motion for Leave to file the unredacted exhibits under seal and at the same time provisionally file the unredacted exhibits under seal with the Court.

a. The "Label Insight Trade Secret Information" provided to Circana under the Master Services Agreement and Accompanying Statements of Work.

75. The product-related data and information provided to Circana under the Master Services Agreement and accompanying Statements of Work within the Label Insight Materials—as further described below and as further defined and described in detail throughout the attached Master Services Agreement, the July 2020 Statement of Work, and the September 2020 Statement of Work—as well as the general know-how related to the development of the Label Insight Materials provided to Circana under the Master Services Agreement and accompanying Statements of Work, is collectively referred to herein as "Label Insight Trade Secret Information."

76. The Label Insight Trade Secret Information while described in further detail throughout this First Amended Complaint, and provided to Circana through the Label Insight Materials, includes the aggregated and detailed product attribute data for hundreds of thousands of consumer packaged goods that Circana was licensed and received under the Master Services Agreement through the Label Insight Materials, as well as NielsenIQ's proprietary list of tens of thousands of product attributes and the categories of those attributes (*i.e.*, views) collected and curated through significant efforts by Label Insight, Inc., and subsequently NielsenIQ. The Label Insight Trade Secret Information also includes other confidential information disclosed to Circana under the Master Services Agreement and the accompanying Statements of Work related to the manner in which Label Insight, Inc., and subsequently NielsenIQ, developed the aggregated and detailed product attribute data contained within the Label Insight Materials, including, without limitation, the proprietary machine learning and data science used to analyze the data gathered from hundreds of thousands of product labels and how it was determined which attributes apply to each product.

77.     The Label Insight Materials provided to Circana under the Master Services Agreement and accompanying Statements of Work, which are a central component of the Label Insight Trade Secret Information, were comprised primarily of two components. *See* Exhibit 3 at p. 1. First, the Label Insight Materials included ingredient, allergen, attribute, nutrient value, certification information and other data and images compiled, analyzed, and categorized from hundreds of thousands of product labels (collectively defined by the Master Services Agreement as "Product Data and Images"). *Id.* The Product Data and Images encompassed of all of the data and information obtained from the labels and product packaging for, at the very least, hundreds of thousands of CPG products that were independently gathered and analyzed by Label Insight, Inc., and subsequently NielsenIQ, through significant and exhaustive efforts. The Product Data and Images also included an image of the product packaging itself to help demonstrate how the product attributes were displayed on the product label, as shown below.



78.     Second, the Label Insight Materials included further proprietary derived attributes and views of the Product Data and Images for each of the hundreds of thousands of products (*i.e.*, attributes and views that were not included or identified on the product label itself or were otherwise confirmed by Label Insight). The collective aggregation of the "Product Data and Images" and "Views" for the hundreds of thousands of products collected, analyzed, and

categorized by Label Insight is what was collectively defined as "Label Insight Materials" and was the data and information licensed to Circana under the Master Services Agreement and accompanying Statements of Work.

79.    For further clarification, the views within the collectively defined term "Views" are in essence the categories in which Label Insight grouped related attributes—both derived and otherwise. For example, the "Allergens & Intolerances" view includes attributes such as "Dairy Containment" and "Shellfish Containment," while the "Certification" view includes attributes such as "Vegan Certified" and "American Dental Association." An example of one set of views (*i.e.*, categories) created and used by Label Insight, and examples of the type of product attributes within that particular view is provided below.

| Standard Views | Characteristics Included |
| --- | --- |
| Allergens & Intolerances | Lactose Containment, Gluten Containment, Dairy Containment, etc. |

80.    The attributes assigned to each product within the views are either obtained from the product packaging itself (*e.g.,* the product package itself claims it is Vegan) or were derived by Label Insight through detailed inspection and analysis of the ingredients and characteristics listed on the particular product's packaging and careful determination of which of the tens of thousands of attributes apply to that particular product. Even for attributes listed on the product packaging, such as Vegan, Label Insight, Inc., and subsequently NielsenIQ, further analyzes the product ingredients and characteristics to determine which particular Vegan certifications appropriately applied to the product (*e.g.*, Vegan Friendly, Vegan Certified, Cruelty Free and Vegan, Certified Vegan (American Vegetarian Association, etc.).

81.    The numerous "views" and thousands of "attributes" for which each CPG product that was collected, analyzed, and assigned by Label Insight, Inc., and subsequently NielsenIQ,

were identified in Appendix 1 of the July 2020 Statement of Work and again in Appendix 1 of the September 2020 Statement of Work. *See* Exhibit 3 at p. 11-18 and Exhibit 4 at p. 6-15.

82.     Through the Master Services Agreement and accompanying Statements of Work, Circana acknowledged that Label Insight, Inc. owned any and all intellectual property rights in, related to or otherwise concerning the Label Insight Materials provided under the Master Services Agreement and accompanying Statements of Work and that it would not make any derivatives on top of or with respect to such Label Insight Materials. *See* Exhibit 3 at ¶ 4.

83.     Since the effective date of July 1, 2020, and under the protections of the Master Services Agreement and accompanying Statements of Work, Circana was provided with access to the Label Insight Materials. Specifically, Label Insight, Inc., and later NielsenIQ, provided Circana with non-exclusive access to Label Insight's software-as-a-service platform and database— defined in the Master Services Agreement as "LI SaaS Platform" and further defined in the Statements of Work as the "Explore API"—which provided Circana with access to, at the very least, all ascertainable and derived attributes developed and grouped according to the views identified by Label Insight and as set forth in Appendix 1 of the Statements of Work, as well as all conventional label data and information as further set forth in Appendix 1 of the Statements of Work. Conventional data is primarily attributes gathered from the product labels and/or packaging for the hundreds of thousands of products analyzed. The attributes listed within the standard views categories, on the other hand, are the more detailed attributes developed and categorized by Label Insight that often go well beyond what is typically identified on the product label or packaging itself and have to be derived (*i.e.*, determined) by Label Insight.

84.     Through the LI SaaS Platform, Circana could then filter the hundreds of thousands of products and accompanying data collected and analyzed by Label Insight, Inc., and

subsequently NielsenIQ, by a particular product type and/or particular attribute and then export a CSV with the Universal Product Codes ("UPC") for all products associated with that particular product type and/or attribute. From there, Circana could marry the Label Insight data with its own retail sales data to create/refresh audiences like the one made available for sale through LiveRamp, as identified above, or provide retail market measurement services through various platforms.

85.     For instance, within the LI SaaS Platform Circana could first filter all products for a particular category of product, such as "Ice Cream and Frozen Yogurt." From there, if Circana wanted to know which Ice Cream and Frozen Yogurt products were "Low Fat" it could select that attribute from the "Specialty Diets (On-Package)" and "Specialty Diets (Derived)" categories and then export all resulting data to a CSV as shown below.

**Filtering Options through LI SaaS Platform**





**Exported Results from LI SaaS Platform to CSV File**



86.     Label Insight, Inc., and subsequently NielsenIQ, also provided to Circana a CSV (comma separated values) file export delivered through a secure FTP on a quad weekly cadence with respect to the Label Insight Materials by product type. *See* Exhibit 3 at Statement of Work ¶ 2.2; Exhibit 4 at ¶ 2.2.

87.     Through the Master Services Agreement and accompanying Statements of Work, Circana was provided with Label Insight Materials for the following product types in all markets: (i) Alcohol; (ii) Food & Beverage; (iii) Household Cleaners; (iv) OTC Medicine; (v) Personal Care; (vi) Pet Food; and (vii) Supplements. *See* Exhibit 3 at ¶¶ 3-4 and Exhibit 4 at ¶¶ 4-5.

88.     Ultimately, the Label Insight Materials provided to Circana under the Master Services Agreement and accompanying Statements of Work included product data and information for, at the very least, hundreds of thousands of consumer-packaged products—all of which was collected and analyzed by Label Insight, Inc., and subsequently NielsenIQ, and then organized and categorized within the LI SaaS Platform—as well as the determination of which of the tens of thousands of attributes (*i.e.,* characteristics) created by Label Insight, Inc., and subsequently NielsenIQ, and grouped by particular views or categories, applied to each particular product. As stated above, this substantial and detailed product data and information, which was licensed to Circana through the Label Insight Materials, as well as well as the general know-how related to

- 33 -

the collection and development of the Label Insight Materials provided under the Master Services Agreement, is collectively referred to herein as "Label Insight Trade Secret Information."

      b.   <u>Circana's use of the Label Insight Trade Secret Information was expressly limited by the Master Services Agreement and accompanying Statements of Work.</u>

89.    The Master Services Agreement commenced on July 1, 2020 and was agreed to automatically expire on June 30, 2025 (the "***Term***"). *See* Exhibit 3 at ¶ 2. Each twelve-month period during the Term beginning on the Effective Date was referred as a "***Contract Year.***" *Id.* Either party was allowed to terminate the Master Services Agreement after completion of the third Contract Year upon one-hundred eighty (180) days' prior written notice to the other party. *Id.*

90.    Just to access the Label Insight Materials, Circana agreed to pay a specific amount each year during the Term of the Master Services Agreement. *See* Exhibit 3 at ¶ 3. From there, Circana was obligated to pay NielsenIQ a revenue share of all net revenue earned by Circana's use of the Label Insight Materials and the licensing of services comprised of or using Processed Materials created using the Label Insight Materials, as further described below. *See* Exhibit 3 at July 2020 Statement of Work ¶ 5.3; Exhibit 4 at ¶ 6.3.

91.    Through the Master Services Agreement, Circana acknowledged that the Label Insight Trade Secret Information provided under the Master Services Agreement and accompanying Statements of Work was the "Confidential Information" of Label Insight, Inc., and subsequently NielsenIQ, and further agreed that it shall not disclose or cause to be disclosed any Label Insight Trade Secret Information except to those who require access to such information to perform under the Master Services Agreement and to protect the Label Insight Trade Secret Information by using the same degree of care, but no less than a reasonable degree of care, that Circana uses to protect its own confidential information of a like nature to prevent its unauthorized use, dissemination or publication to any unauthorized third parties. *See* Exhibit 3 at ¶ 5.

92.     Circana was prohibited from (and was required to ensure that its customers did not), unless expressly allowed under the Master Services Agreement or the accompanying Statements of Work as a Permitted Use: (i) copy, modify or create derivative works of the Label Insight SaaS Platform and/or the Label Insight Materials; (ii) rent, lease, lend, sell, sublicense, assign, distribute, publish, transfer or otherwise make available the Label Insight SaaS Platform and/or any of the Label Insight Materials to any person or entity; (iii) reverse engineer, disassemble, decompile, decode, adapt or otherwise attempt to derive or gain access to the source code associated with the Label Insight SaaS Platform, in whole or in part; (iv) damage, destroy, disrupt, disable, impair, interfere with or otherwise impede or harm in any manner the Label Insight SaaS Platform, in whole or in part; (v) access or use the Label Insight SaaS Platform and/or the Label Insight Materials in any manner or for any purpose that infringes, misappropriates or otherwise violates any Intellectual Property Right or other right of any third party, or that violates any applicable law; and/or (vi) access or use the Label Insight SaaS Platform and/or the Label Insight Materials for purposes of competitive analysis of the Label Insight SaaS Platform or the Label Insight Materials. *See* Exhibit 3 at July Statement of Work ¶ 5.2 ("Non-Permitted Uses") and Exhibit 4 at ¶ 6.2 ("Non-Permitted Uses").

93.     Under the Master Services Agreement and the accompanying Statements of Work, Circana's Permitted Use of the Label Insight Materials was expressly limited in several ways, which differed slightly depending on the particular Statement of Work applicable to the particular services provided by Circana using the Label Insight Materials (*i.e.*, either as part of its retail measurement software services or as part of its targeting/audience services, such as the one made available for sale through LiveRamp).

*i.  Permitted Use under the July 2020 Statement of Work*

94.     The July 2020 Statement of Work—entitled "Service Software and Specifications"—set forth, among other things, Circana's permitted use of the Label Insight Materials in connection with Circana's "market measurement services, the consumer/shopper and media measurement services and other services provided by [Circana] pursuant to which it collects data from retailers, processes such data and provide the data to [Circana's clients], as well as any products or services related or derived from this processed data, each as offered for sale by [Circana] or its affiliates." *See* Exhibit 3 at ¶ 5.1(b).

95.     Under the July 2020 Statement of Work, Circana was only permitted to use the LI SaaS Platform for internal business analysis and evaluation, including determining specific monetization opportunities with Circana's customers. *Id.* at ¶ 5.1(a). Circana was then only permitted to use the Label Insight Materials, which were made available to Circana both through the LI SaaS Platform and CSV files, to ***process*** the Label Insight Materials using Circana's proprietary software and data quality control and enhancement processes (*i.e.,* to develop Processed Materials using Label Insight Materials), to ***incorporate*** such Processed Materials into existing and/or newly developed Company Services (*i.e.*, incorporating Processed Materials using Label Insight Materials into Circana's market measurement services), and to then ultimately ***provide*** such Company Services to Company Clients pursuant to Customer Contracts. *Id.* These permitted uses—including the right to provide any services incorporating or using the Processed Materials—were expressly limited to the Term of the Master Services Agreement. *See id.* at ¶ 5.1.

96.     "***Customer Contracts***" under the July 2020 Statement of Work, through which Circana's services that incorporated Processed Materials using Label Insight Materials were provided, was defined as any contract entered into between Circana and its clients "***during the***

*Term in which Circana licenses to [Circana's' clients] the Processed Materials." Id.* at ¶ 5.3(a) (emphasis added). Thus, the July 2020 Statement of Work made it explicitly clear that Circana was not permitted to enter into contracts with customers for services incorporating Processed Materials created using the Label Insight Materials after the Term of the Master Services Agreement.

97.     Under the July 2020 Statement of Work, Circana was also required to pay Label Insight, Inc., and subsequently NielsenIQ, a "***Revenue Share***" of all ***"Net Revenue"*** no later than sixty (60) days after the end of each calendar quarter. *See* Exhibit 3 at July Statement of Work ¶ 5.3(b). "***Net Revenue***" was defined as all revenue recognized or to be recognized by Circana "***from the licensing during the given period of the Processed Materials***." *Id.* at ¶ 5.3(c) (emphasis added). Therefore, at all times under the July 2020 Statement of Work, Circana was also obligated to pay Label Insight, Inc., and subsequently NielsenIQ, a share of revenues earned from licensing any Processed Materials. This served as another limitation on Circana's right to use the Processed Materials.

98.     On information and belief, since termination of the Master Services Agreement, Circana has not paid any royalties for its use of Label Insight Materials or Processed Materials created using Label Insight Materials within the services listed under the July 2020 Statement of Work. If Circana has continued to use Label Insight Materials or Processed Materials created using Label Insight Materials within those services after termination, such use constitutes breach of the Master Services Agreement and misappropriation of the Label Insight Trade Secret Information.

        *ii.   Permitted Use under the September 2020 Statement of Work*

99.     The September 2020 Statement of Work—entitled "Label Insight Materials and IRI Audiences"—set forth, among other things, Circana's permitted use of the Label Insight Materials in connection with Circana's "***Company Targeting/Audiences Services***," which were defined as

Circana's media analytics services, including audiences for activation across digital, TV and mobile platforms. *See* Exhibit 4 at ¶ 6.1(a).

100.     Under the September 2020 Statement of Work, Circana was only permitted to use the Label Insight Materials to ***process*** the Label Insight Materials using Circana's software and data quality control and enhancement processes to create Processed Materials (*i.e.,* to develop materials, such as audiences, using Label Insight Materials), to ***incorporate*** those Processed Materials into existing and/or newly developed Company Targeting/Audience Services (*i.e.*, incorporating the audiences created using the Label Insight Materials into Circana's audience targeting services), and then to ultimately ***provide*** such Company Targeting/Audience Services incorporating the Processed Materials to Circana's clients. *Id.* The permitted uses under the September 2020 Statement of Work, including Circana's right to provide any audience targeting services incorporating or using the Processed Materials created using the Label Insight Materials— were expressly limited to the Term. *Id.* at ¶ 6.1.

101.     Under the September 2020 Statement of Work, Circana was then required to pay Label Insight, Inc., and subsequently NielsenIQ, a royalty percentage of all the Net Revenue earned in a given calendar quarter from licensing "***Joint LI-IRI Audiences***" to Circana's clients no later than sixty (60) days after the end of that calendar quarter. *Id.* at ¶ 6.3(b). "***Joint LI-IRI Audiences***" was defined by the September 2020 Statement of Work as any Company Targeting/Audience Services, as defined above, that incorporated any of the Processed Materials created using the Label Insight Materials and that were licensed to Circana's client's ***during*** the September 2020 Statement of Work. *Id.* at ¶ 6.3(a) Therefore, Circana's use of Processed Materials created using the Label Insight Materials was limited to the Term and always required Circana to pay a revenue

share within 60 days of every quarter. This served as another limitation on Circana's right to use the Processed Materials.

      c. <u>Termination of the Master Services Agreement prohibited any further use of Label Insight Trade Secret Information, including any Processed Materials created using the Label Insight Trade Secret Information.</u>

102.    Upon termination of the Master Services Agreement, each party was required, upon the written request of the other party, to immediately return to the other or destroy any and all Confidential Information, as defined by the Master Services Agreement, of the other party, which included all Label Insight Materials; provided that: (i) except as provided in an applicable Statement of Work, all rights, licenses, consents and authorizations granted by Label Insight, Inc., and subsequently NielsenIQ, to Circana, including, but not limited to, Circana's use of the Label Insight SaaS Platform and Label Insight Materials in accordance with the Master Services Agreement and applicable Statement of Work, would <u>immediately terminate</u>, and (ii) Circana shall permanently delete all Label Insight Materials in its possession within seven (7) business days after the termination of the Agreement, except as necessary to fulfill Customer Contracts (as defined in the July 2020 Statement of Work), in each case such Label Insight Materials were to be deleted within seven (7) business days after the fulfillment of such Customer Contracts. *See* Exhibit 3 at ¶ 2.

103.    Termination of the Master Services Agreement also terminated the parties' obligations to continue any further activities therein, provided that rights and obligations of the parties under Articles 2 and 4 – 8 of the Agreement and the restrictions set forth in the SOW, survived termination of the Master Services Agreement. *Id.*

104.    Therefore, upon termination of the Master Services Agreement, all rights, licenses, consents and authorizations granted by Label Insight, Inc., and subsequently NielsenIQ, to Circana

were terminated immediately. This included Circana's right to use the Label Insight Materials to create new Processed Materials, as well as Circana's right to license or sell any Processed Materials created using the Label Insight Materials or continuing to offer services containing Processed Materials created using Label Insight Materials. *See* Exhibit 3 at ¶ 2.

105.    Nothing in the Master Services Agreement or the accompanying Statements of Work permitted Circana to continue its use of Label Insight Materials to create new Processed Materials after termination of the Master Services Agreement. And nothing in the Master Services Agreement or the accompanying Statements of Work permitted Circana to use or license Processed Materials created using the Label Insight Materials, such as audiences, after termination of the Master Services Agreement. The only exception being in a very narrow and explicit set of circumstances that were designed to allow Circana to continue servicing existing license agreements entered during the Term of the Master Services Agreement for a limited period of time.

106.    Indeed, while the Master Services Agreement states that Circana may own all right, title and interest in and to the Processed Materials (as defined by the accompanying Statements of Work), that statement is immediately followed by language expressly stating that those rights are "***subject to the license to the [Label Insight] Materials granted herein***." *See* Exhibit 3 at ¶ 4 (emphasis added). Once the license to the Label Insight Materials was terminated, so was the right to use or license Processed Materials created using those Label Insight Materials with the limited exception listed in Paragraphs 113-116 of this First Amended Complaint. And, on information and belief, none of the limited exceptions for Circana's continued use of Processed Materials created using Label Insight Materials after termination of Master Services Agreement apply in this case; therefore, with the termination of the Master Services Agreement, Circana's right to use any Processed Materials, as well as other rights, were terminated.

107. In fact, numerous provisions in the Master Services Agreement and accompanying Statements of Work make it clear that Circana's use of any Label Insight Trade Secret Information or Processed Materials created during the Term of the Master Services Agreement by using the Label Insight Trade Secret Information came with several relevant limitations, including, without limitation, temporal limitations and revenue share payment obligations for any licensing of Processed Materials or sale of services containing such Processed Materials.

108. ***Licensing of Processed Materials was a "Permitted Use" Expressly Limited by the Term of the Master Services Agreement and Statements of Work.*** First, providing services incorporating Processed Materials (as defined by the Statements of Work) was a "Permitted Use" licensed by NielsenIQ under the Master Services Agreement and was expressly limited to the Term of the Master Services Agreement and subject to termination by NielsenIQ. *See* Exhibit 3 at July 2020 Statement of Work ¶ 5.3(a); Exhibit 4 at ¶ 6.1(a).

109. For instance, and as stated above, Circana's Permitted Use under the July 2020 Statement of Work was limited to: (i) creating Processed Materials using the Label Insight Materials by processing the Label Insight Materials through Circana's software and data quality control and enhancement processes; (ii) incorporating those Processed Materials into Circana's market measurement services; and (iii) providing "***such services***" (*i.e.*, those incorporating Processed Materials created using Label Insight Materials) to Circana's clients through "***Customer Contracts***." Customer Contracts was defined as those contracts entered into between Circana and its clients "***during the Term in which [Circana] licenses to Company Clients the Processed Materials***." *See* Exhibit 3 at July 2020 Statement of Work ¶ 5.3(a) (emphasis added). Therefore, Circana's right to provide services incorporating Processed Materials was a "Permitted Use" under the July 2020 Statement of Work and was limited to the Term of the Master Services Agreement,

limited to Customer Contracts entered during the Term, and subject to termination by NielsenIQ. *See, e.g.,* Exhibit 3 at ¶ 2 (noting that upon termination, "all rights, licenses, consents and authorizations," which would include Circana's Permitted Uses would "immediately terminate").

110. Similarly, Circana's Permitted Use under the September 2020 Statement of Work was limited to: (i) creating Processed Materials (*i.e.*, audiences) using the Label Insight Materials by processing the Label Insight Materials through Circana's software and data quality control and enhancement processes; (ii) incorporating those Processed Materials into Circana's Targeting/Audience Services; and (iii) providing "***such***" Targeting/Audience Services (*i.e.*, those services incorporating Processed Materials (*i.e.,* audiences) created using Label Insight Materials) to Circana's clients for such clients' business use. *See* Exhibit 4 at ¶ 6.1(a). Thus, Circana's provision of Targeting/Audience Services using or incorporating Processed Materials created using Label Insight Materials was a "Permitted Use" under the September 2020 Statement of Work and limited to the Term of the Master Services Agreement and subject to termination by NielsenIQ. *See, e.g.,* Exhibit 3 at ¶ 2 (noting that upon termination, "all rights, licenses, consents and authorizations," which would include Circana's Permitted Uses would "immediately terminate").

111. ***Circana was Obligated to Pay Royalties for any Use of Processed Materials— Further Demonstrating that Circana's Rights in the Processed Materials were Limited.*** Circana's obligation to make revenue share payments to NielsenIQ for any use of the Processed Materials was another explicit limitation on Circana's use of those Processed Materials. For instance, under the July 2020 Statement of Work, Circana was required to pay a Revenue Share of Net Revenue within sixty (60) days after the end of each calendar quarter. *See* Exhibit 3 at July 2020 Statement of Work ¶ 5.3(c). Net Revenue was defined as "all revenue recognized or to be recognized by [Circana] in accordance with generally accepted accounting principles ***from the***

*licensing during the given period of the Processed Materials*." *Id.* (emphasis added). Therefore, the July 2020 Statement of Work expressly required Circana to pay a Revenue Share for any licensing of Processed Materials—which were created using the Label Insight Materials—despite the fact that the Master Services Agreement indicated Circana owned all right, title and interest in and to the Processed Materials. Those rights, title, and interest were "subject to the license to [Label Insight] Materials granted" in the Master Services Agreement and accompanying July 2020 Statement of Work. *See* Exhibit 3 at ¶ 4. Therefore, when Circana's license to use the Label Insight Materials was terminated, so was its right to use or sell Processed Materials created using the Label Insight Materials in the manner alleged in this First Amended Complaint.

112. Similarly, under the September 2020 Statement of Work, Circana was required to pay a Revenue Share of all Net Revenue earned in a given calendar quarter from licensing "Joint LI-IRI Audiences" to Company Clients no later than sixty (60) days after the end of each calendar quarter. *See* Exhibit 4 at ¶¶ 6.3(a)-(b). "*Joint LI-IRI Audience*" was defined as Circana's Targeting/Audience Services that "*incorporate the Processed Materials and that are licensed to [Circana's] clients*" during the September 2020 Statement of Work term. *Id.* at ¶ 6.3(a) (emphasis added). Thus, Circana's use of the Processed Materials under the September 2020 Statement of Work, including audiences created and incorporated into Circana's Targeting/Audience Services, was explicitly limited by Circana's obligation to make quarterly Revenue Share payments to NielsenIQ and limited to licenses entered by Circana during the term of the September 2020 Statement of Work (*i.e.*, Circana could not enter new licenses for Processed Materials, such as audiences, after termination of the Master Services Agreement). Those rights, title, and interest were also "subject to the license to [Label Insight] Materials granted" in the Master Services Agreement and accompanying September 2020 Statement of Work. *See* Exhibit 3 at ¶ 4. Therefore,

when Circana's license to use the Label Insight Materials was terminated, so was its right to use or sell Processed Materials created using the Label Insight Materials in the manner alleged in this First Amended Complaint.

113. ***Any use of Processed Materials After Termination was Limited to Fulfilling Contracts and Licenses entered during the Term of the Master Services Agreement—Further Demonstrating that Circana's Rights in the Processed Materials were Limited.*** Finally, upon termination of the Master Services Agreement, all rights, licenses, consents and authorizations granted to Circana—including any permitted uses under the applicable Statements of Work, such as providing services that incorporated Processed Materials created using the Label Insight Materials—were terminated "immediately" except as provided in either of the Statements of Work. *See* Exhibit 3 at ¶ 2.

114. The only exception in the Statements of Work to the immediate termination of all rights, including Circana's right to continue using and/or licensing any Processed Materials created using the Label Insight Materials, however, was for the limited purpose of allowing Circana to continue servicing contracts and licenses entered and existing during the Term of the Master Services Agreement. The exception did <u>not</u> allow Circana to continue using the Processed Materials for any other purpose, including, without limitation, within services licensed to new customers or under new contracts/licenses, such as the audience offered for sale through LiveRamp as identified above. Indeed, the limited exception under both Statements of Work came with three explicit requirements: (i) that any continued Permitted Uses—including providing services incorporating Processed Materials, as explained above—was limited to existing contracts/licenses; (ii) any such use in connection with existing contracts/licenses was still limited to at most twenty-four (24) months after termination of the Master Services Agreement; and (iii) such continued use

was still further conditioned on Circana's continued and timely payment of the quarterly Revenue Share due within sixty (60) days of the end of each quarter during that twenty four month period. *See* Exhibit 3 at July 2020 Statement of Work ¶ 5.3(d); Exhibit 4 at ¶ 6.3(c).

115. Specifically, under the July 2020 Statement of Work, Circana was allowed to continue the Permitted Uses set forth under that statement of work after termination <u>only</u> "for such Customer Contracts after the Term for up to twenty-four (24) months from the end of the Term, provided that [Circana] continues to pay…the Revenue Share during such twenty four month period after the Term." *See* Exhibit 3 at July 2020 Statement of Work ¶ 5.3(d). As stated above, "Customer Contracts" was defined as any contract entered "***during the Term***" in which Circana licenses to its clients "***the Processed Materials***." *Id.* at ¶ 5.3(a) (emphasis added).

116. Similarly, under the September 2020 Statement of Work, Circana was allowed to continue the Permitted Uses forth under that statement of work, including providing any services incorporating Processed Materials, such as audiences, after termination <u>only</u> "for such Joint LI-IRI Audiences after the SOW Term for up to twenty four (24) months from the end of the SOW Term, provided that [Circana] continues to pay…the Revenue Share during such twenty four month period after the SOW Term." *See* Exhibit 4 at ¶ 6.3(c). As stated above, "Joint LI-IRI Audience," like "Customer Contracts," was limited to Circana's Targeting/Audience Services incorporating Processed Materials and that were "licensed to [Circana's] clients during the Term" of the September 2020 Statement of Work. *Id.* at ¶ 6.3(a).

117. The limited manner in which Circana could continue its Permitted Uses under the Statements of Work after termination of the Master Services Agreement—including providing services incorporating Processed Materials—further demonstrates that Circana's use of Processed Materials was explicitly limited by the licenses, authorizations and consents provided by

NielsenIQ under the Master Services Agreement and accompanying Statements of Work because those materials were created using the Label Insight Trade Secret Information. The only exception after termination of the Master Services Agreement being Circana's right to continue servicing existing contracts/licenses after termination for up to two years on the condition that Circana continued to timely pay all required Revenue Share payments, which does not apply here. Had there been no limitations on Circana's use of Processed Materials, these limited exceptions for no more than twenty-four (24) months after termination of the Master Services Agreement, while still requiring Circana's payment of its revenue share, would have been entirely unnecessary and would render those terms meaningless.

118.    Even Circana has represented to this Court previously that any "permitted uses," including continued use of Processed Materials created using the Label Insight Materials, were limited to, at most, a twenty-four (24) month period following the Term of the Master Services Agreement so long as the remaining obligations for such continued use, including, but not limited to Circana's payment all required revenue share for such use, are satisfied. *See* ECF 19 at p. 1.

119.    As a result, Circana was fully aware and had first-hand knowledge that its right to use the Label Insight Trade Secret Information acquired under the Master Services Agreement, including its right to use Processed Materials created using the Label Insight Trade Secret Information, was significantly limited and certainly did not permit its continued use of the Label Insight Trade Secret Information, or sale of Processed Materials created using the Label Insight Trade Secret Information, after termination of the Master Services Agreement unless expressly permitted by the limited exceptions addressed above, which, on information and belief, do not apply to Circana's actions alleged in this First Amended Complaint. Circana has never requested permission, and neither Label Insight, Inc., on information and belief, nor NielsenIQ has ever

consented to any use of the Label Insight Trade Secret Information, or any of the Processed Materials created using the Label Insight Trade Secret Information, in any manner by Circana other than as expressly set forth in the Master Services Agreement.

120.    On information and belief, Circana was aware that Label Insight, Inc. would not have entered into the Master Services Agreement or the accompanying Statements of Work absent the specific use restrictions—including Circana's cessation of all use of the Label Insight Materials, as well as all Processed Materials created using the Label Insight Materials, upon termination of the Master Services Agreement—and the exclusivity and confidentiality obligations put in place by the Master Services Agreement and accompanying Statements of Work to protect the Label Insight Trade Secret Information and Circana's agreement to those obligations.

121.    The above-referenced provisions of the Master Services Agreement and accompanying Statements of Work were narrowly tailored to protect Label Insight, Inc.'s, and subsequently NielsenIQ's, legitimate business interests in the Label Insight Trade Secret Information and the need to maintain the secrecy and confidentiality of those trade secrets.

## III.    Nielsen's Acquisition of Label Insight, Inc. and Termination of the Master Services Agreement.

122.    In 2021, Label Insight, Inc. was acquired by NielsenIQ, wherein NielsenIQ acquired all assets and rights owned by Label Insight, Inc, including, without limitation, all rights under the Maters Services Agreement and the accompanying Statements of Work, as well as all rights to the Label Insight Trade Secret Information and LABEL INSIGHT Mark. Between 2021 and December 2022, NielsenIQ and Circana continued under the Master Services Agreement in the same manner as had been performed since its effective date on July 1, 2020.

123.    However, pursuant to its rights under the Master Services Agreement, NielsenIQ sent Circana a notice of "Termination of the Master Services Agreement" on December 29, 2022,

to become effective on June 30, 2023 (*i.e.,* completion of the third Contract Year). *See* Exhibit 5 ("Termination Notice").

124.     Pursuant to the Termination Notice, NielsenIQ explicitly stated that effective upon termination, all obligations of the parties to continue further activities will cease, and that Circana must comply with the requirement to cease all use of the Label Insight SaaS Platform and Label Insight Materials and permanently delete all Label Insight Materials in its possession. *See id*.

125.     Between termination of the Master Services Agreement on June 30, 2023 and the filing of the initial Complaint in this litigation on October 24, 2024, Circana had made no payments to NielsenIQ for any continued use of Label Insight Trade Secret Information or Processed Materials after June 30, 2023, even if such use were permitted after termination under the limited exceptions under the Statements of Work as addressed above, which it was not.

126.     Therefore, NielsenIQ believed, in good faith, Circana was complying with the limitations and obligations set forth in the Master Services Agreement and accompanying Statements of Work and was not using the Label Insight Trade Secret Information, or any Processed Materials created using the Label Insight Trade Secret Information, in an impermissible manner. That belief, as recently discovered, was, as shown below, misplaced—as Circana continued to offer Processed Materials for sale in breach of the Master Services Agreement and accompanying Statements of Work.

**IV.    Willful Infringement of the LABEL INSIGHT Mark, Unlawful Competition, and Misappropriation of the Label Insight Trade Secret Information.**

127.     As the principal competitor of NielsenIQ in the United States with respect to providing retail/product data and analytics to CPG manufacturers and retailers, Circana and NielsenIQ both provide similar, while at times different, services to the CPG industry. Circana and

NielsenIQ also have many common customers, as it is not unusual for CPG manufacturers and/or retailers to license both parties' products and solutions for its particular needs.

128.    NielsenIQ learned in 2024 that LiveRamp was offering, through its online "store," and on Circana's behalf, "Attribute Audiences" under the category "Circana Audiences" that were purportedly "***Powered By Label Insight,***" as shown below. For example, the attribute audience highlighted below targeted "Organic Food Buyers" and, more specifically, the "Top 70% of [households] buying organic labeled products as tracked by Label Insight."

| Row Labels | # of Segments | % of segments | Average of Digital Ad Targeting Price (CPM) | Average of TV Targeting Price (CPM) | Average of Cost Per Click | Average of Programmatic % of Media | Average of CPM Cap | Average of Advertiser Direct % of Media |
|---|---|---|---|---|---|---|---|---|
| Allergan | 3 | 0.04% | $1.25 | $1.75 | $1.25 | | | 10 |
| Gran Coramino | 1 | 0.01% | $0.95 | $0.95 | | 15 | | 15 |
| Hershey | 15 | 0.22% | $1.00 | $1.00 | $1.00 | 40 | $5.00 | 15 |
| Hershey's | 1 | 0.01% | $0.99 | $1.99 | $0.99 | 40 | $5.00 | 15 |
| IRI Attribute Audiences Powered By Label Insight | 1 | 0.01% | $1.25 | $2.75 | $1.25 | | | 10 |
| IRI > IRI Attribute Audiences Powered by Label Insight > Organic Food Buyers | 1 | 0.01% | $1.25 | $2.75 | $1.25 | | | 10 |
| IRI > NPD are now Circana | 1 | 0.01% | $1.25 | $2.75 | $1.25 | | | 10 |
| Organic Food Buyers: Top 70% of HHs buying organic labeled products as tracked by Label Insight within Edible | 1 | 0.01% | $1.25 | $2.75 | $1.25 | | | 10 |
| IRI Circana ProScores | 1891 | 27.84% | $0.95 | $2.00 | $0.95 | 40 | $3.00 | 10 |
| IRI NPD Circana ProScores | 1225 | 18.03% | $1.15 | $2.15 | $1.15 | 40 | $3.00 | 15 |
| IRI ProScores CPG Audiences | 3022 | 44.49% | $0.89 | $1.97 | $0.89 | 41 | $5.83 | 10 |
| IRI Retailer ProScores | 141 | 2.08% | $0.95 | $2.00 | $0.95 | 40 | $6.00 | 10 |
| IRI Verified CPG Audiences | 82 | 1.21% | $1.25 | $2.75 | $1.25 | 40 | $7.00 | 10 |
| Optimized for TV | 400 | 5.89% | $1.50 | $1.50 | | | | 10 |
| Price Sensitivity Segmentation | 4 | 0.06% | $0.95 | $2.00 | $0.95 | 40 | $7.00 | 10 |
| Proscores | 7 | 0.10% | $0.95 | $2.00 | $0.95 | | | 10 |
| Grand Total | 6793 | 100.00% | $0.99 | $1.99 | $0.96 | 40 | $3.22 | 11 |

129.    On information and belief, and as strongly suggested by the language used to describe and market Circana's audiences, the audience available for sale in 2024 through LiveRamp on behalf of Circana was created using the Label Insight Trade Secret Information. No matter when the audience was created using the Label Insight Trade Secret Information, however, Circana's sale of the audience after termination of the Master Services Agreement to new customers was not permitted by the Master Services Agreement. And even if the audience offered for sale as shown above was originally created during the Term of the Master Services Agreement, the audience, on information and belief, was likely refreshed after termination of the Master Services Agreement.

130.    On information and belief, the data and attributes made available for purchase by LiveRamp under "**IRI Attribute Audiences Powered by Label Insight**" are marketed and sold

by Circana to, at the very least, LiveRamp and its end customers, in connection with the LABEL INSIGHT Mark. And on information an belief, the audience was provided to LiveRamp after termination of the Master Services Agreement on June 30, 2023, or was otherwise not removed by Circana after termination. This belief is further supported by the fact that the "Circana Audiences" information indicates that "IRI + NPD are now Circana," which did not occur until, on information and belief, the end of 2023.

131.    In fact, Circana confirmed it used Label Insight Trade Secret Information in connection with its audiences in an email to NielsenIQ on February 13, 2024, wherein it indicated it owed Label Insight revenue share for using its data in Circana's audiences between 2020 and June 2023. Circana claimed it had not been aware of the contract that was executed for its use of Label Insight data in Circana's audiences—on information and belief the September 2020 Statement of Work—yet had been using the Label Insight data in connection with those audiences anyway. The February 13, 2024 email claimed that Circana had gone through all of its audiences from 2020 through 2023 that "had Label Insight data in them" and identified those audiences, including that it owed NielsenIQ a royalty payment. Therefore, on information and belief, the audiences sold by Circana either had Label Insight Trade Secret Information in them (as indicated by Circana's own statement) or were built using Label Insight Trade Secret Information.

132.    Circana's February 13, 2024 email also indicated it had sold hundreds of millions of impressions for numerous audiences between 2020 and June of 2023—several of which explicitly used the LABEL INSIGHT Mark, including the "Organic Food Buyers" audience shown above, which had been sold through LiveRamp.

133.    Circana's February 13, 2024 email made no mention of any sale of audiences created using Label Insight Trade Secret Information between June 30, 2023 and February 13,

2024—nor did it attempt to make any payment for such sales. Nor did Circana indicate it would be continuing to sell audiences created using Label Insight Trade Secret Information after February 13, 2024. Any such use would have been prohibited by the Master Services Agreement and a violation of NielsenIQ's rights in the Label Insight Trade Secret Information.

134.    Since termination of the Master Services Agreement on June 30, 2023, unless qualifying under a limited exception, Circana was obligated to, at the very least, delete all Label Insight Trade Secret Information in its possession and cease all use of the Label Insight Trade Secret Information, including the use and/or sale of any Processed Materials created using the Label Insight Trade Secret Information at any time, such as audiences. However, on information and belief, Circana never deleted the Label Insight Trade Secret Information received under the Master Services Agreement and offered and sold, at the very least, audiences created using that that Label Insight Trade Secret Information in connection with the LABEL INSIGHT Mark, including, without limitation, to LiveRamp and its retail and/or manufacturer customers.

135.    On information and belief, anyone with login credentials to the LiveRamp store could login and purchase consumer impressions based on the data and attributes offered by Circana and purportedly "***Powered by Label Insight***" in 2024, as shown below.



136.    To confirm this, NielsenIQ had a small number of impressions of the "Organic Food Buyers" audience listed through LiveRamp purchased in September of 2024. The purchase was successful and over 1,900 impressions were run on the Circana audience. This purchase was a wholly new contract/license entered long after termination of the Master Services Agreement and, on information and belief, is not the only sale of audiences by Circana after termination through a new license/contract.

137.    Therefore, on information and belief, Circana is or was, at least as of October 24, 2024, knowingly and willfully promoting and selling, at the very least, audiences created using the Label Insight Trade Secret Information in connection with the LABEL INSIGHT Mark to new customers and/or through new contracts/licenses without NielsenIQ's authorization and using and/or disclosing audiences created using the Label Insight Trade Secret Information in connection with the LABEL INSIGHT MARK to, at the very least, LiveRamp and its retail and/manufacturer customers without Label Insight's consent and in violation of the Master Services Agreement and the law.

138.    Circana is aware and has at all times been aware that unauthorized disclosure and/or use of the Label Insight Trade Secret Information and/or materials created using the Label Insight Trade Secret Information is prohibited by the Master Services Agreement and that the Label Insight Trade Secret Information was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret information and limit use of the trade secret information as prescribed by the Master Services Agreement and the law.

139.    In fact, since the filing of the original Complaint in this litigation on October 24, 2024, Circana has expressly acknowledged on numerous occasions that it does <u>not</u> have, at the very least, an unrestricted right to use Processed Materials created using Label Insight Trade Secret

Information. First, in Circana's previous Motion to Dismiss NielsenIQ's Complaint, Circana argued it was permitted to continue selling previously-created audiences, but only for 24 months following termination of the Master Services Agreement and on the condition that revenue share owed for such use is paid to NielsenIQ. *See* ECF No. 19 at p. 1 and 14. Circana repeated its understanding—albeit an incomplete understanding—that any continuation of its previously "Permitted Uses" of the Label Insight materials was limited to, at most, twenty four months after termination of the Master Services Agreement in exchange for the appropriate revenue share. *See* ECF 27 at p. 1.

140.     But Circana's continuation of its previously "Permitted Uses" under the Master Services Agreement and accompanying Statements of Work after termination on June 30, 2023, including, at that very least, its continued use of Label Insight Trade Secret Information and sale of audiences created using Label Insight Trade Secret Information, was not authorized for several reasons. First, and as addressed above, any continuation of the previously "Permitted Uses" by Circana was limited to servicing existing Customer Contracts/licenses entered into during the Term of the Master Services Agreement, which would not apply to new sales of audiences to new customers after termination of the Master Services Agreement (as in this case).

141.     Second, Circana has tried to conceal the fact that it had failed to timely pay any revenue share for its continuation of the previously "Permitted Uses"—even if such continuation after termination of the Master Services Agreement was permitted, which it was not. Specifically, in its Motion to Dismiss NielsenIQ's Complaint, Circana vaguely claimed that any revenue share owed for its sale of audiences created using Label Insight data "has already been tendered." *See* ECF No. 19 at p. 1. Circana did not indicate when that revenue share had been tendered. Nor did

Circana indicate the amount of the payment. Or what use of the Label Insight Trade Secret Information the payment was purportedly for.

142.    In its Reply, Circana then claimed in a footnote that it believed "it has paid NielsenIQ all that is due…under the continued use provision of the MSA (which totaled a little over $22,000)." *See* ECF 27 at p. 10, n. 3. Again, Circana did not indicate when that amount had purportedly been paid. Or what use of the Label Insight Trade Secret Information the payment was purportedly for. NielsenIQ believes the reason Circana did not provide this detail is clear—it knew it had failed to make timely payments, even if the payments were for the continuation of Permitted Uses after termination as permitted by the Statements of Work in limited instances, which it was not.

143.    Instead, Circana attempted to make a wire payment to NielsenIQ for a little over $22,000 on December 23, 2024—two months after this lawsuit was filed accusing Circana of unlawful use of Label Insight Trade Secret Information and breach of the Master Services Agreement through, at the very least, its sale of audiences created using the Label Insight Trade Secret Information, and only days before Circana filed its Motion to Dismiss.

144.    Inconsistent with prior practices, Circana did not request an invoice from NielsenIQ for the payment. Circana provided no explanation for this payment besides noting in the "Remark" line "REF*f/k/a Label Insight\." And Circana provided no remittance advice instructions to NielsenIQ with the wire payment to inform NielsenIQ what the payment was for or how to apply the payment. Instead, Circana simply tried to slip the payment into NielsenIQ's pocket in an unsuccessful attempt, on information and belief, to address its breach and misappropriation.

145.    Circana also never mentioned the details of this payment in its briefing with the Court—perhaps attempting to hide the fact that Circana knows its right to use Processed Materials

was not unrestricted and the fact that Circana had failed to make timely revenue share payments to NielsenIQ—even if its sale of audiences after termination of the Master Services Agreement had been authorized, which it was not. Nor did Circana or its counsel alert NielsenIQ or its counsel that the wire payment had been issued on December 23, 2024.

146. The limited exceptions for Circana's continuation of its "Permitted Uses" after termination of the Master Services Agreement were expressly conditioned on Circana's continued payment of the Revenue Share required under the Statements of Work. Under both Statements of Work, those Revenue Share payments were due within sixty (60) days after the end of each calendar quarter. *See* Exhibit 3 at July 2020 Statement of Work ¶ 5.3(c) and Exhibit 4 at ¶ 6.3(b). Therefore, even if Circana were permitted to continue its "Permitted Uses" after termination, including its sale of audiences created using the Label Insight Trade Secret Information, Circana's first Revenue Share payment following termination of the Master Services Agreement would have been due November 29, 2023—yet no payment for use after termination was made by that deadline. Circana's next Revenue Share payment would have been due February 29, 2024—yet no payment for use after termination was made by that deadline. Circana's next Revenue Share payment would have been due May 30, 2024—yet, again, no payment for use after termination was made by that deadline.

147. Instead, Circana continued to sell audiences created using Label Insight Trade Secret Information and made no attempt to pay for its sale of those audiences—likely because it knew such sales were unauthorized—until after it was sued for breach of contract, trademark information, and trade secret misappropriation. Circana cannot try and rectify its unlawful actions now by attempting to pay what it believes would have been owed under the Master Services Agreement.

148.    Circana's use of the Label Insight Trade Secret Information and/or use of Processed Materials created using the Label Insight Trade Secret Information will provide significant competitive benefits to Circana, including in its development and/or offering of competing CPG data and analytic products and services and the commercialization of those products and services in competition with NielsenIQ, while at the same time providing none of the benefits NielsenIQ received for such use during the Term of the Master Services Agreement.

149.    And use of the LABEL INSIGHT Mark in connection with those services improperly suggests to retailers and/or manufacturers that Label Insight and/or NielsenIQ is affiliated, connected, and/or associated with Circana's services, which it is not, and has not been for nearly two years.

150.    Use of the LABEL INSIGHT Mark in connection with Circana's goods and services and through its advertising and promotion, is also likely to cause, and, on information and belief, already has caused, confusion, mistake, or deception among consumers as to the nature, characteristics, qualities or geographic origin of its goods, services, or commercial activities.

151.    Through this unlawful suggestion of affiliation, connection, and/or association, or misrepresentation of the nature, characteristics, qualities or geographic origin of its goods, services, or commercial activities, NielsenIQ's goodwill has been harmed, and continues to be harmed, through Circana's actions. Moreover, consumers continue to be harmed by the false association, affiliation, and connection created by the unauthorized use of the LABEL INSIGHT Mark. Consumers expecting to receive the same reliable data and insight they have come to expect from the Label Insight products and services, will instead purchase a product that has no affiliation with NielsenIQ and has none of the same guarantees and reliability of the Label Insight products. For example, as Circana's access to the Label Insight SaaS Platform was terminated as of June 30,

2023, the Label Insight Trade Secret Information offered to retailers and/or manufactures by Circana may no longer be accurate, even if refreshed with new sales data. If so, Circana's use of the LABEL INSIGHT Mark in connection with those inferior and/or inaccurate services will significantly harm the goodwill that has been established in the mark. Circana's lack of access to the Label Insight SaaS Platform after termination of the Master Services Agreement would not, as a practical matter, have stopped Circana from using the CSV files previously provided under the Master Services Agreement containing Label Insight Trade Secret Information or any data Circana had previously exported from the Label Insight SaaS Platform containing Label Insight Trade Secret Information after termination and in violation of the Master Services Agreement.

152.    Circana's aforementioned acts to misappropriate the Label Insight Trade Secret Information, infringe the LABEL INSIGHT Mark, and engage in unlawful competition was, and continues to be, on information and belief, intentional, knowing, willful, malicious, fraudulent and oppressive.

**V.    Severe and Irreparable Harmed Caused by Misappropriation of Label Insight Trade Secret Information, Infringement of the LABEL INSIGHT Mark, and Unlawful Competition.**

153.    Through Circana's willful violation of NielsenIQ's exclusive rights in the Label Insight Trade Secret Information and LABEL INSIGHT Mark, Circana has caused substantial harm to NielsenIQ, including in the State of Illinois where it is headquartered and elsewhere, and such harm will continue if Circana is allowed to continue violating NielsenIQ's exclusive rights.

154.    Most obviously, Circana's violations of NielsenIQ's rights in its trade secrets and trademark will result in clear monetary damages that include, at the very least, lost licensing fees, the stolen value of the millions of dollars Label Insight, Inc., and subsequently NielsenIQ, spent

in developing and protecting the Label Insight Trade Secret Information and LABEL INSIGHT Mark, and any lost sales as a result of Circana's willful misconduct and unlawful competition.

155.    By misappropriating and unlawfully using the Label Insight Trade Secret Information, including, at the very least, through its use of audiences created using the Label Insight Trade Secret Information, and using the LABEL INSIGHT Mark without NielsenIQ's authorization, Circana has unlawfully obtained the ability to compete directly with NielsenIQ and its Label Insight offering and has been unjustly enriched as a result. For example, Circana would not have had the capability of collecting the same level of data provided in the Label Insight Trade Secret Information through lawful means. Yet through their unlawful acts, further bolstered by their unlawful use of the LABEL INSIGHT Mark, Circana has been able to offer competitive services without having to invest the same amount of time and resources that Label Insight, Inc., and subsequently NielsenIQ, invested in independently developing its trade secret information and building the goodwill in the LABEL INSIGHT Mark.

156.    Circana's use of the LABEL INSIGHT Mark is also likely to mislead, deceive, and confuse the purchasing public and the trade. It is likely that consumers will mistakenly believe that NielsenIQ and/or the Label Insight product is connected, associated or in some way affiliated with Circana, when in fact no such connection, association or affiliation exists. Circana does not have a legitimate reason or good faith basis to use the LABEL INSIGHT Mark in connection with their competing CPG goods and services.

157.    As a result of the foregoing, Circana has significantly impacted NielsenIQ's revenues. Circana's unlawful use of the Label Insight Trade Secret Information and LABEL INSIGHT Mark has also harmed, and will continue to harm, NielsenIQ and consumers in ways that cannot be compensated by monetary damages. As a result, NielsenIQ is suffering, and will

continue to suffer, significant and long-term irreparable harm—including harm to its customer goodwill, industry relationships, and hard-earned market share, as well as the potential loss of the secrecy of its confidential information and trade secrets.

158.    Essentially, NielsenIQ's stellar reputation and goodwill, as well as the confidentiality of its Label Insight Trade Secret Information, has been stolen and is now entirely at the mercy of Circana. As a result, NielsenIQ has been forced to bring this action to safeguard its valuable intellectual property rights and enforce the terms and conditions of the Master Services Agreement with Circana.

## Count I
## Federal Trademark Infringement (15 U.S.C. § 1114)

159.    NielsenIQ re-alleges and incorporates by reference Paragraphs 1 through 158 of this First Amended Complaint as though set forth fully under this Count.

160.    Section 32 of the Lanham Act, 15 U.S.C. § 1114, precludes the use in commerce of any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or cause mistake, or to deceive consumers.

161.    NielsenIQ is the sole and exclusive owner of the trademark registration from the United States Patent and Trademark Office for **LABEL INSIGHT** (Reg. No. 5055429) in connection with *"[p]roviding product data collection and management services for use in food product label analysis and marketing; providing product data solutions and analytics, namely, analyzing and compiling collected business data for food product labeling; business data analysis, namely, providing product data for analysis for food product label marketing and sales"* (IC 035) (the "Registered LABEL INSIGHT Mark"). *See* Exhibit 1 (Reg. No. 5055429).

162.    The Registered LABEL INSIGHT Mark is a valid and subsisting trademark which is in full force and effect.  Pursuant to 15 U.S.C. § 1057 and 15 U.S.C. § 1115, the registration serves as prima facie evidence of the mark's validity and NielsenIQ's right to use such mark in connection with the registered goods and/or services.

163.    Without NielsenIQ's authorization or consent, Circana is publicly advertising, selling, offering for sale, and/or distributing CPG product/label data and analytic services, and related goods/services, in connection with the Registered LABEL INSIGHT Mark in interstate commerce and in direct competition with genuine NielsenIQ data and analytic services.

164.    Circana's unauthorized use of the Registered LABEL INSIGHT Mark and/or a colorable imitation of the Registered LABEL INSIGHT Mark, in connection with competing CPG product/label data and analytic services, and related goods/services, is likely to cause, and, on information and belief, already has caused, confusion, mistake, or deception among consumers as to the source, quality, affiliation, sponsorship or authenticity of the parties' goods and/or services—depriving NielsenIQ of the goodwill established in its Registered LABEL INSIGHT Mark.

165.    On information and belief, Circana deliberately adopted and/or is using the Registered LABEL INSIGHT Mark with a bad faith intent to cause consumer confusion and/or trade on the goodwill established by NielsenIQ

166.    As a direct and proximate result of Circana's conduct, as alleged herein, NielsenIQ has suffered and continues to suffer significant damages in an amount to be later proven and determined at trial.

167.    Circana's use of the Registered LABEL INSIGHT Mark in connection with competing CPG data and analytic services has also caused and, unless restrained and enjoined,

will continue to cause consumer confusion and irreparable harm, damage and injury to NielsenIQ for which NielsenIQ has no adequate remedy at law.

168.    Circana's willful and continued use of the Registered LABEL INSIGHT Mark despite knowing that it was not authorized to use the Registered LABEL INSIGHT Mark makes this case an exceptional case for which an award of NielsenIQ's reasonable attorneys' fees and costs are warranted pursuant to 15 U.S.C. § 1117.

169.    NielsenIQ is therefore entitled, among other relief, injunctive relief and an award of actual damages, Circana's profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116 and 1117, together with prejudgment and post-judgment interest.

**Count II**
**Federal Unfair Competition (15 U.S.C. § 1125)**

170.    NielsenIQ re-alleges and incorporates by reference Paragraphs 1 through 158 of this First Amended Complaint as though set forth fully under this Count.

171.    Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), precludes use in commerce on or in connection with any goods or services any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is  likely to cause confusion, to cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of its goods, services or commercial activities by another person.

172.    Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), also precludes use in commerce on or in connection with any goods or services any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of

fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, qualities or geographic origin of its goods, services, or commercial activities.

173.    Through extensive and continuous use of the LABEL INSIGHT Mark since as early as 2015 and registration of **L A B E L INSIGHT** (Reg. No. 5055429) in 2016, NielsenIQ has established and owns trademark rights in its LABEL INSIGHT Mark.

174.    Without NielsenIQ's authorization or consent, Circana is publicly advertising, selling, offering for sale, and/or distributing CPG product/label data and analytic services, and related goods/services, in connection with the LABEL INSIGHT Mark in interstate commerce and in direct competition with genuine NielsenIQ data and analytic services.

175.    Circana's unauthorized use of the LABEL INSIGHT Mark in connection with competing CPG data and analytic services, and related goods/services, is likely to cause, and, on information and belief, already has caused, confusion, mistake, or deception among consumers as to the source, quality, affiliation, sponsorship or authenticity of the parties' goods and/or services—depriving NielsenIQ of the goodwill established in its LABEL INSIGHT Mark.

176.    Circana's unauthorized use of the LABEL INSIGHT Mark in connection with competing CPG data and analytic services, and related goods/services, and through its advertising and promotion, is likely to cause, and, on information and belief, already has caused, confusion, mistake, or deception among consumers as to the nature, characteristics, qualities or geographic origin of its goods, services, or commercial activities.

177.    On information and belief, Circana deliberately adopted and/or is using the LABEL INSIGHT Mark with a bad faith intent to cause consumer confusion and/or trade on the goodwill established by NielsenIQ .

178.     As a direct and proximate result of Circana's conduct, as alleged herein, NielsenIQ has suffered and continues to suffer significant damages in an amount to be later proven and determined at trial.

179.     Circana's use of the LABEL INSIGHT Mark in connection with competing CPG product/label data and analytic services has caused and, unless restrained and enjoined, will continue to cause consumer confusion and irreparable harm, damage and injury to NielsenIQ for which NielsenIQ has no adequate remedy at law.

180.     Circana's willful and continued use of the LABEL INSIGHT Mark despite knowing that it was not authorized to use the LABEL INSIGHT MARK makes this case an exceptional case for which an award of NielsenIQ's reasonable attorneys' fees and costs are warranted pursuant to 15 U.S.C. § 1117.

181.     NielsenIQ is therefore entitled, among other relief, injunctive relief and an award of actual damages, Circana's profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116 and 1117, together with prejudgment and post-judgment interest.

## Count III
## Common Law Trademark Infringement/Unfair Competition

182.     NielsenIQ re-alleges and incorporates by reference Paragraphs 1 through 158 of this First Amended Complaint as though set forth fully under this Count.

183.     Through extensive and continuous use of the LABEL INSIGHT Mark since as early as 2015, as well as registration of **LABEL INSIGHT** (Reg. No. 5055429) in 2016, NielsenIQ has established and owns trademark rights in its LABEL INSIGHT Mark.

184.     Circana's conduct complained of herein, including, without limitation, unauthorized use of the LABEL INSIGHT Mark in connection with competing CPG product/label

data and analytic services, and related goods/services, constitute common law trademark infringement and unfair competition in violation of the laws of the State of Illinois.

185.    Upon information and belief, Circana deliberately adopted and/or is using the LABEL INSIGHT Mark with a bad faith intent to cause consumer confusion and/or trade on the goodwill established by NielsenIQ.

186.    Circana's unauthorized use of the LABEL INSIGHT Mark in connection with competing CPG data and analytic services, and related goods/services, is likely to cause, and, on information and belief, already has caused, confusion, mistake, or deception among consumers as to the source, quality, affiliation, sponsorship or authenticity of the parties' goods and/or services—depriving NielsenIQ of the goodwill established in its LABEL INSIGHT Mark.

187.    Circana's unauthorized use of the LABEL INSIGHT Mark in connection with competing CPG data and analytic services, and related goods/services, and through its advertising and promotion, is likely to cause, and, on information and belief, already has caused, confusion, mistake, or deception among consumers as to the nature, characteristics, qualities or geographic origin of its goods, services, or commercial activities.

188.    As a direct and proximate result of Circana's conduct, as alleged herein, NielsenIQ has suffered and continues to suffer significant damages in an amount to be later proven and determined at trial.

189.    Circana's use of the LABEL INSIGHT Mark in connection with competing CPG product/label data and analytic services has also caused and, unless restrained and enjoined, will continue to cause consumer confusion and irreparable harm, damage and injury to NielsenIQ for which NielsenIQ has no adequate remedy at law.

190.     Upon information and belief, Circana has engaged in their unlawful conduct alleged herein intentionally, maliciously, fraudulently and oppressively, entitling NielsenIQ to punitive damages in an amount to be determined at trial.

191.     NielsenIQ is therefore entitled, among other relief, injunctive relief and an award of actual damages, Circana's profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action, together with prejudgment and post-judgment interest.

**Count IV**
**Illinois Uniform Deceptive Trade Practices Act  (815 ILCS 510)**

192.     NielsenIQ re-alleges and incorporates by reference Paragraphs 1 through 158 of this First Amended Complaint as though set forth fully under this Count.

193.     Section 510/2 of the Illinois Uniform Deceptive Trade Practices Act provides in relevant part:

> A person engages in a deceptive trade practice when, in the course of his or her business…the person:
>
> (1) passes off goods or services of those of another;
> (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;
> (3) causes likelihood of confusion or of misunderstanding as to the affiliation, connection or association with or certification by another,…or
> (12) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

815 ILCS 510/2.

194.     Circana's unauthorized use of the LABEL INSIGHT Mark in connection with competing CPG product/label data and analytic services, and related goods/services, as alleged herein, is likely to cause, and, on information and belief, has caused, confusion, mistake, or deception among consumers as to the source, quality, affiliation, sponsorship or authenticity of the parties' goods and/or services or the nature, characteristics, qualities or geographic origin of

Circana's goods, services, or commercial activities—depriving NielsenIQ of the goodwill established in its LABEL INSIGHT Mark. These acts constitute unfair and deceptive trade practices in the course of Circana's business in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1, *et seq*.

195. On information and belief, Circana deliberately and willfully adopted and/or is using the LABEL INSIGHT Mark with a bad faith intent to cause consumer confusion and/or trade on the goodwill established by NielsenIQ since at least as early as 2015.

196. Circana's use of the LABEL INSIGHT Mark in connection with competing CPG product/label data and analytic services, and related goods/services has caused and, unless restrained and enjoined, will continue to cause consumer confusion and irreparable harm, damage and injury to NielsenIQ for which NielsenIQ has no adequate remedy at law.

197. NielsenIQ is therefore entitled, among other relief, injunctive relief and an award of reasonable attorneys' fees, and costs of the action, together with prejudgment and post-judgment interest.

**Count V**
**Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.*)**

198. NielsenIQ re-alleges and incorporates by reference Paragraphs 1 through 158 of this First Amended Complaint as though set forth fully under this Count.

199. Section 505/2 of the Illinois Consumer Fraud and Deception Business Practices Act provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to…the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person in fact has been misled, deceived or damaged thereby.

815 ILCS 505/2.

200.     Circana's unauthorized use of the LABEL INSIGHT Mark and Label Insight Trade Secret Information in connection with competing CPG data and analytic services, and related goods/services, is likely to cause, and already has caused, confusion, mistake, or deception among consumers as to the source, quality, affiliation, sponsorship or authenticity of the parties' goods and/or services or the nature, characteristics, qualities or geographic origin of Circana's goods, services, or commercial activities—depriving NielsenIQ of the goodwill established in the LABEL INSIGHT Mark and its rights in the Label Insight Trade Secret Information. These acts constitute unfair or deceptive trade practices in the course of Circana's business and cause a direct and indirect injury to consumers generally in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1, *et seq*.

201.     On information and belief, Circana deliberately adopted and/or is using the LABEL INSIGHT Mark and Label Insight Trade Secret Information with a bad faith intent to cause consumer confusion and/or trade on the goodwill established by NielsenIQ since at least as early as 2015.

202.     As a direct and proximate result of Circana's conduct, as alleged herein, NielsenIQ has suffered and continues to suffer significant damages in an amount to be later proven and determined at trial.

203.     Circana's use of the LABEL INSIGHT Mark in connection with competing CPG product/label data and analytic services, and related goods/services has caused and, unless restrained and enjoined, will continue to cause consumer confusion and irreparable harm, damage and injury to NielsenIQ for which NielsenIQ has no adequate remedy at law.

- 67 -

204.     NielsenIQ is therefore entitled, among other relief, injunctive relief and an award of actual damages, Circana's profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action, together with prejudgment and post-judgment interest.

**Count VI**
**Misappropriation of Trade Secrets Pursuant to the**
**Federal Defend Trade Secrets Act (18 U.S.C. § 1831 et seq.)**

205.     NielsenIQ re-alleges and incorporates by reference Paragraphs 1 through 158 of this First Amended Complaint as though set forth fully under this Count.

206.     Under the Defend Trade Secrets Act ("DTSA"), the "owner of a trade secret that is misappropriated may bring a civil action…if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." *See* 18 U.S.C. § 1836(b)(1).

207.     The DTSA defines the term "trade secrets" to include "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if…(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *See* 18 U.S.C. § 1839(3).

208.     NielsenIQ is the owner of the Label Insight Trade Secret Information, and such information constitutes trade secrets under the DTSA.

209. As stated previously, NielsenIQ takes reasonable steps to protect and maintain the secrecy of the Label Insight Trade Secret Information, including, but not limited to, requiring its employees to enter into non-disclosure agreements that require its employees to keep the Label Insight Trade Secret Information confidential and restricting access to and/or use of the Label Insight Trade Secret Information. On information and belief, Label Insight, Inc, prior to its acquisition in 2021, took similarly reasonable steps to protect the confidentiality and secrecy of the Label Insight Trade Secret Information and independent economic value derived therefrom.

210. The Label Insight Trade Secret Information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

211. The Label Insight Trade Secret Information is related to a product or service used in, sold, shipped, ordered, and/or intended for use in interstate commerce.

212. On information and belief, Circana has, through improper means, used the Label Insight Trade Secret Information as part of its business in activities related to competition with NielsenIQ and in a manner that undermines NielsenIQ's business operations, including, without limitation, in connection with the sale and/or license of materials or services, such as audiences, created using Label Insight Trade Secret Information and potentially in connection with the sale and/or license of materials or services containing and/or disclosing the Label Insight Trade Secret Information.

213. On information and belief, Circana specifically misappropriated the Label Insight Trade Secret Information in one or more of the following ways and as further described above:

    a. By acquiring the Label Insight Trade Secret Information through improper means;

b.  By disclosing and/or using the Label Insight Trade Secret Information without NielsenIQ's express or implied consent after using improper means to acquire knowledge of the Label Insight Trade Secret Information;

c.  By disclosing and/or using the Label Insight Trade Secret Information without NielsenIQ's express or implied consent while, at the time of the disclosure and/or use, knowing, or having reason to know, that knowledge of the Label Insight Trade Secret Information was acquired using improper means;

d.  By disclosing and/or using the Label Insight Trade Secret Information without NielsenIQ's express or implied consent while, at the time of the disclosure and/or use, knowing, or having reason to know, that knowledge of the Label Insight Trade Secret Information was acquired under circumstances giving rise to a duty to maintain the secrecy of the Label Insight Trade Secret Information or limit the use of the Label Insight Trade Secret Information;

e.  By disclosing and/or using the Label Insight Trade Secret Information without NielsenIQ's express or implied consent while, at the time of the disclosure and/or use, knowing, or having reason to know, that knowledge of the Label Insight Trade Secret Information was derived from or through a person who owed a duty to Label Insight to maintain the secrecy of the Label Insight Trade Secret Information or limit the use of the Label Insight Trade Secret Information; and/or

f.  By disclosing and/or using the Label Insight Trade Secret Information without NielsenIQ's express or implied consent while knowing or having reason to know the Label Insight Trade Secret Information was a trade secret and that knowledge

of the Label Insight Trade Secret Information had been acquired by accident or mistake.

214.   On information and belief, Circana took such actions willfully, maliciously, and/or in reckless disregard for NielsenIQ's rights, in that Circana knew, or had reason to know, that it was not authorized to use and/or disclose the Label Insight Trade Secret Information after termination of the Master Services Agreement, including, without limitation, by creating materials or services using the Label Insight Trade Secret Information and/or through the sale and/or license of materials or services, such as audiences, created using Label Insight Trade Secret Information, especially in activities related to competition with NielsenIQ or in a manner that undermines NielsenIQ's business operations.

215.   As a direct and proximate result of Circana's misappropriation of the Label Insight Trade Secret Information, NielsenIQ has and will continue to suffer actual damages and/or Circana has been unjustly enriched, in an amount to be proven and determined at trial. In lieu of damages measured by any other methods, the damages caused by the misappropriation may also be measured by imposition of liability for a reasonable royalty for Circana's unauthorized disclosure and/or use of the Label Insight Trade Secret Information. *See* 18 U.S.C § 1836(b)(3)(B).

216.   As a result of Circana's misappropriation of the Label Insight Trade Secret Information, NielsenIQ has and will continue to suffer irreparable harm and is entitled to injunctive relief pursuant to 18 U.S.C § 1836(b)(3)(A) and an order requiring any other affirmative acts that the Court deems proper and necessary to protect the Label Insight Trade Secret Information, including, without limitation use of Processed Materials containing Label Insight Trade Secret Information or that were created using Label Insight Trade Secret Information.  If Circana's conduct is not enjoined, NielsenIQ will continue to suffer severe competitive harm, irreparable

injury, and significant damages. Therefore, by operating in a highly competitive market, NielsenIQ will continue suffering irreparable harm absent injunctive relief.

217.    Pursuant to 18 U.S.C. § 1836(b)(3)(C), NielsenIQ is entitled to exemplary damages for Circana's willful and malicious misappropriation of Label Insight's Trade Secret Information.

218.    Pursuant to 18 U.S.C. § 1836(b)(3)(D), NielsenIQ is entitled to recovery of its attorneys' fees because of Circana's willful and malicious misappropriation of the Label Insight Trade Secret Information.

219.    NielsenIQ is therefore entitled, among other relief, injunctive relief and an award of actual damages, Circana's profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action, together with prejudgment and post-judgment interest.

**Count VII**
**Misappropriation of Trade Secrets Pursuant to the**
**Illinois Trade Secrets Act (765 ILCS 1065/1 et seq.)**

220.    NielsenIQ re-alleges and incorporates by reference Paragraphs 1 through 158 of this First Amended Complaint as though set forth fully under this Count.

221.    The Illinois Trade Secrets Act prohibits the misappropriation of trade secrets and defines the term "trade secrets" to include "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." *See* 765 Ill. Comp. Stat. 1065/2(d).

222.    Under the Illinois Trade Secrets Act, misappropriation means any of the following: "(1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without the express or implied consent by a person who: (A) Used improper means to acquire knowledge of the trade secret; (B) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (i) Derived from or through a person who had utilized improper means to acquire it; (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (4) before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake. *See* 765 Ill. Comp. Stat. 1065/2(b).

223.    NielsenIQ is the owner of the Label Insight Trade Secret Information, and such information constitutes trade secrets under the Illinois Trade Secrets Act.

224.    As stated previously, NielsenIQ takes reasonable steps to protect and maintain the secrecy of the Label Insight Trade Secret Information, including, but not limited to, requiring its employees to enter into non-disclosure agreements that require its employees to keep the Label Insight Trade Secret Information confidential and restricting access to and/or use of the Label Insight Trade Secret Information. On information and belief, Label Insight, Inc, prior to its acquisition in 2021, took similarly reasonable steps to protect the confidentiality and secrecy of the Label Insight Trade Secret Information and independent economic value derived therefrom.

225.    The Label Insight Trade Secret Information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through

proper means by, another person who can obtain economic value from the disclosure or use of the information.

226.    On information and belief, Circana has, through improper means, used and/or disclosed the Label Insight Trade Secret Information as part of its business in activities related to competition with NielsenIQ and in a manner that undermines NielsenIQ's business operations, including, without limitation, in connection with the sale and/or license of materials or services, such as audiences, created using Label Insight Trade Secret Information and potentially in connection with the sale and/or license of materials or services containing and/or disclosing the Label Insight Trade Secret Information.

227.    On information and belief, Circana specifically misappropriated the Label Insight Trade Secret Information in one or more of the following ways and as further described above:

  b.   By acquiring the Label Insight Trade Secret Information through improper means;

  c.   By disclosing and/or using the Label Insight Trade Secret Information without NielsenIQ's express or implied consent after using improper means to acquire knowledge of the Label Insight Trade Secret Information;

  d.   By disclosing and/or using the Label Insight Trade Secret Information without NielsenIQ's express or implied consent while, at the time of the disclosure and/or use, knowing, or having reason to know, that knowledge of the Label Insight Trade Secret Information was acquired using improper means;

  e.   By disclosing and/or using the Label Insight Trade Secret Information without NielsenIQ's express or implied consent while, at the time of the disclosure and/or use, knowing, or having reason to know, that knowledge of the Label Insight Trade Secret Information was acquired under circumstances giving rise to a duty to

- 74 -

maintain the secrecy of the Label Insight Trade Secret Information or limit the use of the Label Insight Trade Secret Information;

f. By disclosing and/or using the Label Insight Trade Secret Information without NielsenIQ's express or implied consent while, at the time of the disclosure and/or use, knowing, or having reason to know, that knowledge of the Label Insight Trade Secret Information was derived from or through a person who owed a duty to Label Insight to maintain the secrecy of the Label Insight Trade Secret Information or limit the use of the Label Insight Trade Secret Information; and/or

g. By disclosing and/or using the Label Insight Trade Secret Information without NielsenIQ's express or implied consent while knowing or having reason to know the Label Insight Trade Secret Information was a trade secret and that knowledge of the Label Insight Trade Secret Information had been acquired by accident or mistake.

228.    On information and belief, Circana took such actions willfully, maliciously, and/or in reckless disregard for NielsenIQ's rights, in that Circana knew, or had reason to know, that it was not authorized to use and/or disclose the Label Insight Trade Secret Information after termination of the Master Services Agreement, including, without limitation, by creating materials or services using the Label Insight Trade Secret Information and/or through the sale and/or license of materials or services, such as audiences, created using Label Insight Trade Secret Information, especially in activities related to competition with NielsenIQ or in a manner that undermines NielsenIQ's business operations.

229.    As a direct and proximate result of Circana's misappropriation of the Label Insight Trade Secret Information, NielsenIQ has and will continue to suffer actual damages and/or Circana

has been unjustly enriched, in an amount to be determined at trial pursuant to 765 Ill. Comp. Stat. 1065/4. In lieu of damages measured by any other methods, the damages caused by the misappropriation may also be measured by imposition of liability for a reasonable royalty for Circana's unauthorized disclosure and/or use of the Label Insight Trade Secret Information.

230.    As a result of Circana's misappropriation of the Label Insight Trade Secret Information, NielsenIQ has and will continue to suffer irreparable harm and is entitled to injunctive relief pursuant to 765 Ill. Comp. Stat. 1065/3 and an order requiring any other affirmative acts that the Court deems proper and necessary to protect the Label Insight Trade Secret Information, including, without limitation use of Processed Materials containing Label Insight Trade Secret Information or that were created using Label Insight Trade Secret Information.  If Circana's conduct is not enjoined, NielsenIQ will continue to suffer severe competitive harm, irreparable injury, and significant damages. Therefore, by operating in a highly competitive market, NielsenIQ will continue suffering irreparable harm absent injunctive relief.

231.    Pursuant to 765 Ill. Comp. Stat. 1065/4(b), NielsenIQ is entitled to exemplary damages for Circana's willful and malicious misappropriation of the Label Insight Trade Secret Information.

232.    Pursuant to 765 Ill. Comp. Stat. 1065/5, NielsenIQ is entitled to recovery of its attorneys' fees because of Circana's willful and malicious misappropriation of the Label Insight Trade Secret Information.

233.    NielsenIQ is therefore entitled, among other relief, injunctive relief and an award of actual damages, Circana's profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action, together with prejudgment and post-judgment interest.

**Count VIII**
**Breach of the Master Services Agreement and Accompanying Statements of Work**

234.    NielsenIQ re-alleges and incorporates by reference Paragraphs 1 through 158 of this First Amended Complaint as though set forth fully under this Count.

235.    Circana, by and through its predecessor Information Resources, Inc., and Label Insight, Inc. entered into a valid and enforceable contract, with offer and acceptance, and supported by consideration and definite and certain terms, entitled the Master Services Agreement. Pursuant to the Master Services Agreement, Circana, by and through its predecessor Information Resources, Inc., and NielsenIQ, by and through its predecessor Label Insight, Inc., also entered into a July 2020 Statement of Work and a September 2020 Statement of Work. A copy of the original Master Services Agreement, with accompanying July 2020 Statement of Work, is attached as Exhibit 3 and incorporated by reference herein. A copy of the original September 2020 Statement of Work is attached as Exhibit 4.

236.    Label Insight Inc., along with all rights and assets, including, without limitation those rights under the Master Services Agreement and the accompanying Statements of Work, were acquired by NielsenIQ in 2021.

237.    NielsenIQ, and previously Label Insight, Inc., on information and belief, fully performed all the conditions, covenants, and obligations required on its part under the Master Services Agreement and the accompanying Statements of Work.

238.    Under the Master Services Agreement and the accompanying Statements of Work, Circana agreed to several obligations, including, without limitation, those identified below. For example, upon termination of the Master Services Agreement, Circana was contractually obligated to, at the very least, cease all use of the Label Insight Trade Secret Information and delete all Label Insight Trade Secret Information in its possession. *See* Exhibit 3 at ¶ 2.

239.    Circana also acknowledged through the Master Services Agreement that the Label Insight Trade Secret Information provided under the Master Services Agreement is the confidential information of Label Insight, Inc., and thus subsequently NielsenIQ, and further agreed that it shall not disclose or cause to be disclosed any Label Insight Trade Secret Information except to those who require access to such information to perform under the Master Services Agreement and to protect the Label Insight Trade Secret Information by using the same degree of care, but no less than a reasonable degree of care, that Circana uses to protect its own confidential information of a like nature to prevent its unauthorized use, dissemination or publication to any unauthorized third parties. *See* Exhibit 3 at ¶ 5.

240.    Circana was further prohibited from (and required to ensure that its customers did not), unless expressly allowed under the Master Services Agreement, the following acts: (i) copy, modify or create derivative works of the Label Insight SaaS Platform and/or the Label Insight Materials; (ii) rent, lease, lend, sell, sublicense, assign, distribute, publish, transfer or otherwise make available the Label Insight SaaS Platform and/or any of the Label Insight Materials to any person or entity; (iii) reverse engineer, disassemble, decompile, decode, adapt or otherwise attempt to derive or gain access to the source code associated with the Label Insight SaaS Platform, in whole or in part; (iv) damage, destroy, disrupt, disable, impair, interfere with or otherwise impede or harm in any manner the Label Insight SaaS Platform, in whole or in part; (v) access or use the Label Insight SaaS Platform and/or the Label Insight Materials in any manner or for any purpose that infringes, misappropriates or otherwise violates any Intellectual Property Right or other right of any third part, or that violates any applicable law; and/or (vi) access or use the Label Insight SaaS Platform and/or the Label Insight Materials for purposes of competitive analysis of the Label

Insight SaaS Platform or the Label Insight Materials. *See* Exhibit 3 at July 2020 Statement of Work ¶ 5.2; Exhibit 4 at ¶ 6.2.

241.     Circana was further prohibited from continuing any of the Permitted Uses under the Statements of Work after termination of the Master Services Agreement, including, without limitation, continuing to provide services creating using and/or containing the Label Insight Materials licensed under the Master Services Agreement and accompanying Statements of Work. *See* Exhibit 3 at July 2020 Statement of Work ¶ 5.1; Exhibit 4 at ¶ 6.1.

242.     All of Circana's rights, licenses, consents and authorizations granted by Label Insight, Inc., and subsequently NielsenIQ, through the Master Services Agreement and accompany Statements of Work, including all of Circana's Permitted Uses under the Statements of Work, were immediately terminated upon termination of the Master Services Agreement except as provided in the Statements of Work. *See* Exhibit 3 at ¶ 2.

243.     The limited exceptions to Circana's continuation of its Permitted Uses under the Statements of Work after termination of the Master Services Agreement do not apply to Circana's use of the Label Insight Trade Secret Information and/or materials created using the Label Insight Trade Secret Information after termination of the Master Services Agreement.

244.     The Master Services Agreement was terminated as of June 30, 2023 through the December 29, 2022 notice of "Termination of the Master Services Agreement" served on Circana as shown in Exhibit 5 ("Termination Notice").

245.     Circana materially breached the Master Services Agreement and accompanying Statements of Work, including, without limitation, the specific contractual obligations identified above, as well as the implied duty of good faith and fair dealing, by at the very least, misappropriating the Label Insight Trade Secret Information, using the Label Insight Trade Secret

Information beyond the scope permitted in the Master Services Agreement and accompanying Statements of Work and in competition with NielsenIQ, using materials created using the Label Insight Trade Secret Information beyond the scope permitted by the Master Services Agreement and accompanying Statements of Work, and by failing to delete all Label Insight Trade Secret Information in its possession after termination of the Master Services Agreement and accompanying Statements of Work in 2023. On information and belief, these breaches were taken fraudulently and willfully, and misappropriate NielsenIQ's intellectual property rights, including, without limitation, misappropriation of the Label Insight Trade Secret Information.

246. As a direct and proximate result of Circana's breach of the Master Services Agreement and accompanying Statements of Work, NielsenIQ has sustained and will continue to sustain financial losses and/or Circana has been unjustly enriched, in an amount to be determined and prove at trial. At a minimum, NielsenIQ has lost the commercial advantage of maintaining the confidentiality of the Label Insight Trade Secret Information, lost profits as a result of Circana's unlawful use of the Label Insight Trade Secret Information and/or materials created using the Label Insight Trade Secret Information, and/or lost royalties from Circana's use of the Label Insight Trade Secret Information and/or materials created using the Label Insight Trade Secret Information.

247. As a direct and proximate result of Circana's breach of the Master Services Agreement and accompanying Statements of Work, NielsenIQ has and will continue to suffer irreparable harm. If Circana's conduct is not enjoined, NielsenIQ will continue to suffer severe competitive harm, irreparable injury, and significant damages.

## JURY DEMAND

In accordance with Rule 38 of the Federal Rules of Civil Procedure, NielsenIQ hereby demands a trial by jury on all claims and issue so triable.

## PRAYER FOR RELIEF

WHEREFORE, for violation of the foregoing counts, NielsenIQ respectfully prays for the following relief:

A.  Judgment in favor of NielsenIQ and finding Circana liable on Counts I-VIII;

B.  That this Court enter a preliminary injunction, thereafter to be made permanent, against Circana and its respective affiliates, subsidiaries, agents, representative, licenses, successors, and assigns – and all those acting for them, on their behalf, or in concert with them – that, among other things: (1) compels Circana to fully abide by the terms of the Master Services Agreement and accompanying Statements of Work; (2) compels Circana to return to NielsenIQ all records and information reflecting Label Insight Trade Secret Information; (3) orders Circana to immediately cease all use of Label Insight Trade Secret Information and all materials created using the Label Insight Trade Secret Information, including, without limitation, by removing all Label Insight Trade Secret Information, including all derivative data, information, analysis, or materials of any kind that include, are based on, or utilize all or part of Label Insight Trade Secret Information, from its services, audiences, databases, algorithms, coding, software or systems; (4) prohibits Circana from directly or indirectly using Label Insight Trade Secret Information and any materials created using the Label Insight Trade Secret Information; (5) prohibits Circana from directly or indirectly disclosing Label Insight Trade Secret Information or any materials created using or containing the Label Insight Trade Secret Information; (6) orders Circana to identify all Label Insight Trade Secret Information that has been disclosed by Circana and the names of any

individual or entity to whom such disclosure was made; (7) orders Circana to cease all use of the LABEL INSIGHT Mark, or any confusingly similar mark thereto, in connection with CPG data and analytic services, or any related goods and/or services;

C.  That this Court enter an Order requiring Circana to preserve all documents, electronically stored information, and other information relevant to the factual allegations and claims contained in this Complaint, including any communications, text messages, or emails on personal electronic devices, such as cellular telephones, or stored in email or other cloud storage accounts;

D.  That this Court enter an Order requiring Circana to stipulate and agree with counsel for NielsenIQ on a non-party forensic vendor to perform a forensic review of Circana's computer systems to confirm the deletion and cessation of all use of Label Insight Trade Secret Information and materials created using the Label Insight Trade Secret Information;

E.  That this Court award NielsenIQ actual and compensatory damages in an amount to be determined at trial, or in the alternative the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the Circana's unauthorized disclosure or use of Label Insight Trade Secret Information and unauthorized use of the LABEL INSIGHT Mark;

F.  That this Court also award NielsenIQ disgorgement of Circana's revenues and/or gains wrongfully acquired, exemplary or punitive damages, its reasonable attorney's fees and costs, and pre-judgment and post-judgment interest;

G.  That this Court award such further relief to which NielsenIQ may be entitled under the circumstances.

Dated:  March 27, 2025

By: */s/ Justin Powers Mulligan*
Michael A. Parks, Il. Bar No. 6217230
Brendan M. Bement, Il. Bar No. 6338045
THOMPSON COBURN LLP
55 E. Monroe Street, 37th Floor
Chicago, Illinois 60603

P: (312) 346-7500
F: (312) 580-2201
mparks@thompsoncoburn.com
bbement@thompsoncoburn.com

Matthew A. Braunel, Il. Bar No. 6276394
Justin P. Mulligan, Il. Bar No. 6319388
THOMPSON COBURN LLP
One U.S. Bank Plaza
Saint Louis, Missouri 63101
P: (314) 552-6000
F: (314) 552-7000
mbraunel@thompsoncoburn.com
jmulligan@thompsoncoburn.com

John Thorne, Il. Bar No. 6181458
James M. Webster (*pro hac vice forthcoming*)
Joseph S. Hall (*pro hac vice forthcoming*)
KELLOGG HANSEN TODD FIGEL &
FREDERICK PLLC
1615 M Street, NW, Suite 400
Washington, DC  20036
P: (202) 326-7900
F: (202) 326-7999
jthorne@kellogghansen.com
jwebster@kellogghansen.com
jhall@kellogghansen.com

*Attorneys for Nielsen Consumer LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was filed electronically on Thursday, March 27, 2025, with the Clerk of the Court to be served by operation of the Court's electronic filing system on all registered counsel of record.

*/s/ Justin Powers Mulligan*