UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Nielsen Consumer LLC, *Plaintiff*, v. Circana, LLC, *Defendant*. | No. 24 CV 10946 Judge Lindsay C. Jenkins |

MEMORANDUM OPINION AND ORDER

Nielsen Consumer LLC ("NielsenIQ") has filed an amended complaint against Circana, LLC ("Circana"), alleging a variety of trademark, trade secret, and breach of contract claims under both federal and state law. [Dkt. 31.][1] The court previously allowed NielsenIQ to proceed on its trademark infringement claims (Counts I–V) but dismissed the trade secret (Counts VI–VII) and breach of contract (Count VIII) claims without prejudice. Circana now moves to dismiss NielsenIQ's amended complaint. [Dkt. 38; Dkt. 39.] For the following reasons, the motion is denied.

I.  Background[2]

The court assumes the parties' familiarity with the facts of the case, as summarized in its order partially dismissing Plaintiffs' original complaint. [Dkt. 30.] It summarizes here what is newly alleged and most relevant to resolving the motion to dismiss.

In 2021, NielsenIQ acquired Label Insight, Inc., and in turn acquired the "Label Insight" service, as well as several agreements that Label Insight, Inc. had formed with Circana's predecessor. These included (1) a Master Services Agreement ("MSA" or the "contract"), in July 2020, [Dkt. 31-3; *see* Dkt. 31 at ¶¶ 22–29]; (2) a July 2020 Statement of Work ("SOW"), [Dkt. 31-3]; and (3) a September 2020 SOW. [Dkt. 31-4.] Under those agreements, Circana licensed aggregated consumer product data ("LI Materials") from Label Insight, Inc. (later, NielsenIQ), which it used to filter its

---

[1] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

[2] Factual allegations are taken from NielsenIQ's Amended Complaint, [Dkt. 1], and accepted as true for the purposes of the motion. *Smith v. First Hosp. Lab'ys, Inc.*, 77 F.4th 603, 607 (7th Cir. 2023). In setting forth the facts at the pleading stage, the Court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

own consumer purchasing data into subsets of "Audiences" for advertisers to purchase for use in targeted marketing campaigns. [*Id.* at ¶ 25.]

The MSA and incorporated SOWs delineate how Circana may use NielsenIQ's data. The MSA and July 2020 SOW establish three permitted uses: (1) "copy[ing], distribut[ing], display[ing], transmit[ting], modify[ing] and prepar[ing] derivative works of the LI Materials" to create "Processed Materials"; (2) incorporating such Processed Materials into Circana's services; and (3) providing these services incorporating the Processed Materials to third-party Circana clients "pursuant to Company Contracts." [Dkt. 31-3 at 7–8, ¶ 5.1(b).] "Processed Materials" are "the LI Materials which have been manipulated by [Circana] during the [contract] Term to the extent that such data is unique (i.e., not immediately identifiable to the original LI Materials) or has been integrated into Company Services." [*Id.*] While Circana would own "all right, title and interest in and to the Processed Materials," this ownership was "subject to the license to LI Materials" granted by the MSA. [*Id.* at 2, ¶ 4.] The MSA limits "Customer Contracts" to those "in which [Circana] licenses to [Circana] Clients the Processed Materials" and formed "*during the [MSA] Term.*" [*Id.* at 8, ¶ 5.3(a) (emphasis added).]

Both SOWs required Circana to pay Label Insight, Inc. (subsequently, NielsenIQ) a revenue share for its use of the LI Materials. The July 2020 SOW required Circana to pay a portion of all revenue "from the licensing during the given period of the Processed Materials." [*Id.* at 8–9, ¶ 5.3.] And the September 2020 SOW—not previously submitted in connection with NielsenIQ's initial complaint or Circana's first motion to dismiss—permitted Circana to continue licensing "Joint LI-IRI Audiences" to existing company clients for up to 24 months after the termination of the SOW, provided it also continued to timely pay NielsenIQ a revenue share. [Dkt. 31-4 at 4–5, ¶¶ 6.3(b)–6.4.] "Joint LI-IRI Audiences" are defined as "[Circana] Targeting/Audience Services that incorporate the Processed Materials and that are *licensed to [Circana] Clients during the SOW Term.*" [*Id.* at 5, ¶ 6.3(a) (emphasis added).] NielsenIQ alleges that, as of the beginning of this lawsuit, Circana had not paid any royalties for either its use of the LI Materials or of Processed Materials created using the LI Materials. [Dkt. 31 at ¶ 125.]

After the acquisition, the MSA and SOWs were terminated on June 30, 2023, which triggered certain obligations by the parties. [*Id.* at ¶¶ 102, 123.] First, except as provided in a SOW, "all rights, licenses, consents and authorizations granted by [Label Insight, Inc., and subsequently NielsenIQ,] to [Circana], including [Circana]'s use of the … Label Insight Materials" would immediately terminate. [Dkt. 31-3 at 1, ¶ 2.] Second, Circana was required to permanently delete all LI Materials within seven business days after the termination of the Agreement, "except as necessary to fulfill Customer Contracts," in which case the LI Materials had to be deleted within seven business days after the fulfillment of Customer Contracts. [*Id.*]

In 2024, however, NielsenIQ learned that another company, LiveRamp, was continuing to offer "Attribute Audiences Powered by Label Insight" for sale, obtained from Circana. [Dkt. 31 at ¶¶ 30–39, 128–130.] To confirm that these Audiences could be bought by any new Circana customer (that is, outside of a Circana-client relationship formed before June 30, 2023), NielsenIQ directed and successfully complete a test purchase. [*Id.* at ¶¶ 136–137.]

NielsenIQ alleges that Circana not only failed to delete its data but continued to use that data without having paid the required revenue share, beyond the scope permitted by the contract and in competition with NielsenIQ. [*Id.* at ¶¶ 134, 245.] And NielsenIQ contends that in doing so, Circana breached the MSA and misappropriated its trade secrets. [*Id.*]

## II. Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the plaintiff's claims. The Court takes well-pleaded factual allegations as true and draws reasonable inferences in the plaintiff's favor. *Reardon v. Danley*, 74 F.4th 825, 827 (7th Cir. 2023); *Choice v. Kohn L. Firm, S.C.*, 77 F.4th 636, 638 (7th Cir. 2023). "To survive a motion to dismiss under Rule 12(b)(6), plaintiff's complaint must allege facts which, when taken as true, plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Cochran v. Ill. State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (cleaned up).

## III. Analysis

### A. Breach of Contract (Count VIII)

Illinois law articulates four elements for establishing a breach of contract claim: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) a breach of contract by the defendant; and (4) resultant injury to the plaintiff." *PNC Bank, Nat'l Ass'n v. Boytor*, 109 F.4th 495, 506 (7th Cir. 2024). In construing contracts under Illinois law, courts "aim to ascertain the parties' intent by first consulting the plain and ordinary meaning of the contract language." *Page v. Alliant Credit Union*, 52 F.4th 340, 346 (7th Cir. 2022) (cleaned up). If the language of the contract is susceptible to more than one meaning, it is ambiguous, and the court can "look to extrinsic evidence to determine the parties' intent." *Baro v. Lake Cnty. Fed. of Teachers Local 504*, 57 F.4th 582, 587 (7th Cir. 2023).

On the previous motion to dismiss, the court agreed that NielsenIQ had not sufficiently alleged a breach. [Dkt. 30 at 11.] In its initial complaint, NielsenIQ asked the court to infer that the availability of Audiences on LiveRamp confirms that Circana continued to use the LI Materials without permission after the MSA was

3

terminated. [*Id.* at 14.] But because NielsenIQ had not (1) defined "Audiences,"[3] (2) explained how or when LI Materials were used to create them, (3) alleged when it learned that Circana was offering Audiences on LiveRamp, or (4) alleged when Circana had begun making the Audiences information available on LiveRamp, the necessary inferences could not reasonably be drawn from the facts as alleged. *Stachowski v. Town of Cicero*, 425 F.3d 1075, 1078 (7th Cir. 2005).

The court also found that the MSA, as initially presented, (1) did not restrict Circana's continued use of any services it had developed using the LI Materials prior to termination, and (2) broadly permitted Circana to sell the processed data. [Dkt. 30 at 15; *see* Dkt. 1-3 at ¶ 5.1(b).] The court therefore reasoned that Nielsen had not plausibly alleged that Circana used NielsenIQ data without permission to continue creating new "Processed Materials" after the contract terminated. [*Id.* at 16.]

The amended complaint adequately addresses these identified deficiencies, Circana's arguments notwithstanding. NielsenIQ clarifies that Audiences are Processed Materials created using LI data, rather than LI Materials themselves. [*See* Dkt. 31 at ¶¶ 4–37.] NielsenIQ also alleges when it discovered that Circana was offering Processed Materials for sale to new clients, (beginning in 2024, *see id.* ¶¶ 30–39), and it offers new allegations that these Processed Materials had been impermissibly created after termination. [*See id.*, at ¶¶ 128–130.]

First, NielsenIQ characterizes "Audiences" as sets of target consumers for certain product attributes—that is, where Circana's consumer purchasing data (about what products various people tend to buy) overlaps with NielsenIQ's LI Materials (data about what characteristics various products have). [*See id.* at ¶¶ 5–9.] Retailers and manufacturers then use Audiences to optimize their advertising. In other words, they can focus on marketing certain product characteristics to the consumers who are most likely to be susceptible to that marketing. [*See id.* at ¶¶ 9–12.]

NielsenIQ also alleges that Circana "refreshes" Audiences by updating data inputs to ensure accurate targeting based on current purchasing habits. [*Id.* at 10–12.] That is, Circana could keep creating new Processed Materials by cross-referencing NielsenIQ's LI Materials with an updated dataset of people whose purchasing habits had changed (say, adding in people who did not buy vegan products in 2023 but now do in 2025, while removing those who used to but now don't). [*Id.*] It also alleges that because Circana refreshed these Audiences "on an ongoing basis," it impermissibly continued to use LI Materials—data that Circana was required to have deleted—to create new Processed Materials after the contract's termination. [*Id.* at ¶ 10.]

---

[3] For instance, the initial complaint alleged that Audiences both *use* Label Insight data and *are* Label Insight data. [Dkt. 1 at ¶¶ 12–13.]

4

Circana maintains that it "has not used 'LI Materials' in any way, internally or externally, including for purposes of creating new audiences since the termination of the parties' Agreement." [Dkt. 41 at 8.] It explains that it could not have refreshed its Audiences using LI Materials because NielsenIQ stopped providing new LI Materials after the contract's termination. [*See* Dkt. 41 at 14 (asking, "if NielsenIQ ceased providing Circana with new information, as NielsenIQ alleges, then how could Circana impermissibly use that new information to "refresh" audiences in violation of the Agreement? The answer is simple: it couldn't.")] But Circana does not contend that it could not have generated new Audiences using those *old* LI Materials, or even that it did not retain those materials. [*See* Dkt. 41 at 8.] And in any event, it would be inappropriate for the court to reach the conclusion for which Circana advocates at the pleading stage when factual allegations must be taken as true and reasonable inferences must be drawn in NielsenIQ's favor.

Circana also does not contend that it had in fact timely paid NielsenIQ the appropriate revenue share for post-termination use of the LI Materials—or that its continued use of the LI Materials was not conditioned on that missing amount to begin with. [*See* Dkt. 41 at 8, 15 n.7.] Indeed, Circana acknowledges that although it paid a small amount owed to NielsenIQ at the beginning of this litigation, *see id.* at 15 n.7, it has since discovered that an additional amount remained due. [Dkt. 66.]

In sum, the court cannot agree that NielsenIQ's allegations are merely conclusory. Rather, it has alleged facts to support the reasonable inference that Circana continued to create new Audiences using NielsenIQ data after June 30, 2023. NielsenIQ now also alleges breach via nonpayment, which Circana does not contest. For now, it has met its Rule 12(b)(6) pleading standard on the breach of contract claim.

### B. Trade Secret (Claims VI–VII)

According to NielsenIQ, after termination of the MSA, Circana was required to cease use of the LI Materials. [Dkt. 31 at ¶ 238.] Instead, Circana misappropriated NielsenIQ's trade secrets by creating Audiences and offering Audiences for sale on LiveRamp. [*Id.* at 34.] NielsenIQ alleges that this conduct violates the federal Defend Trade Secrets Act ("DTSA") as well as the Illinois analogue, the Illinois Trade Secrets Act ("ITSA"). Since the elements of the two claims are the same, the Court analyzes them together. *Allstate Ins. Co. v. Ameriprise Fin. Servs.*, 2023 WL 5334638, at *11 (N.D. Ill. Aug. 18, 2023).

To state a claim, "a plaintiff must show that (1) a trade secret existed, (2) the trade secret was misappropriated, and (3) the owner of the trade secret was damaged by the misappropriation." *Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 817 (N.D. Ill. 2014). If the information at issue is protectable, element two—misappropriation—may be satisfied by alleging that "the disclosure or use of a trade secret [was] without express or implied consent." *Allstate Ins. Co.*, 2023 WL 5334638,

at \*22 (citation and internal quotation marks omitted). Given that Circana acquired the LI Materials through the MSA, NielsenIQ relies on the improper disclosure theory.

The court previously dismissed NielsenIQ's trade secret misappropriation claim on two grounds: (1) because NielsenIQ had not described what constituted the trade secrets with enough specificity; and (2) because it failed to plead trade secret misappropriation. The amended complaint adequately addresses both problems.

First, NielsenIQ specifies that its LI Materials are the trade secrets at hand, and it defines them more precisely. It alleges that the LI Materials analyze data gathered from product labels and designate which attributes apply to particular products, which assists retailers and manufacturers by providing "a detailed understanding of the product attributes associated with each product." [Dkt. 31 at ¶¶ 2–3, 13–19, 77–78.] For example, regardless of whether a product is labeled "vegan" or "low sodium", Label Insight analyzes a product's ingredients and other characteristics to see if that attribute truly applies and if so, assigns (or declines to assign) an appropriate "derived" attribute. [Dkt. 31 at ¶¶ 13–19.] This is sufficient to provide notice of the basis of the trade secret claims with enough specificity at the pleading stage. *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1065 (N.D. Ill. 2020) (finding plaintiff adequately identified its trade secrets by alleging that they consisted of "information about its customers, such as their purchase histories and preferences, as well as [its] internal pricing and costing processes"); *Fire 'Em Up, Inc. v. Technocarb Equip. (2004) Ltd.*, 799 F. Supp. 2d 846, 850 (N.D. Ill. 2011) (finding plaintiff's allegations sufficient where it described its trade secrets as including current and prospective customer lists, lists of current and prospective suppliers, "combinations or compilations of materials necessary to create [certain products and services]," and marketing plans and advertising strategies.)

Second, NielsenIQ must also sufficiently allege that Circana misappropriated a trade secret by using it without express or implied consent, which it has now done. *Packaging Corp. of Am., Inc.*, 419 F. Supp. 3d at 1066; *Allstate Ins. Co.*, 2023 WL 5334638, at \*22. The misappropriation analysis tracks the breach of contract analysis. *Sonrai Sys., LLC*, 658 F. Supp. 3d at 616 ("[T]he statutes acknowledge that what begins as permissive use may become misappropriation."). Because the MSA and SOWs govern how Circana was permitted to use the LI Materials, NielsenIQ must allege breach of the MSA to allege misappropriation. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d at 573 ("[M]isappropriation of a trade secret normally is not actionable without either a tort or a breach of contract[.]" (quoting *ConFold Pac., Inc. v. Polaris Indus., Inc.*, 433 F.3d 952, 959 (7th Cir. 2006))).

As explained above, NielsenIQ has now sufficiently alleged that Circana used the LI Materials without permission. The allegations support an inference that the MSA and SOWs prohibited Circana from continuing to create new or updated

6

Audiences using NielsenIQ's trade secrets after termination—perhaps altogether, but at the least, without timely payment of a revenue share.

NielsenIQ "need not prove [its] case at this point in time[; it] need only adequately plead sufficient facts such that [its] claim is 'plausible' and puts the defendant[] on notice of the claims against them such that the defendants can respond." *Vulcan Golf, LLC v. Google, Inc.*, 552 F. Supp. 2d 752, 769 (N.D. Ill. 2008). The amended complaint adequately alleges that its trade secrets are comprised of the LI Materials and that Circana's use of this information constituted misappropriation under the MSA.

### C. Trademark Infringement

Finally, Circana argues that with respect to the trademark infringement claim, documents incorporated into the First Amended Complaint "reveal a new and discrete flaw pertaining to the trademark claim's duration." [Dkt. 50 at 13.] Specifically, the September 2020 SOW "expressly authorized the sale of 'co-branded audiences,'" permitting Circana to include the phrase "Label Insight" on the audience for a designated period after termination. [Dkt. 50 at 13; Dkt. 31-1 at 4 (§ 6.1 "Permitted Uses").] Circana explains that, though it is not seeking reconsideration of the prior order, this SOW necessarily means that NielsenIQ's trademark claim cannot premised on the allegation that it "never" authorized use of the LI Mark. In other words, "the only trademark claim that could logically survive Circana's Motion would be for the post-termination period only." [Dkt. 50 at 13.] NielsenIQ disagrees arguing, among other things, that an "equally plausible interpretation" is that "co-branded audiences simply referred to audiences created utilizing materials from both companies." [Dkt. 44 at 19.] And it argues that Circana's use of the mark after termination of MSA in connection with the sale of audiences terminated Circana's right to use the mark. [*Id.*]

The court declines to dismiss or narrow NielsenIQ's trademark infringement claims based on arguably contradictory assertions raised by the September 2020 SOW. It already concluded that NielsenIQ stated a claim for trademark infringement, and the "winnowing of a claim properly occurs at summary judgment, not at the pleadings stage when the question is simply whether there are sufficient facts alleged to state a plausible claim for relief on some legal theory." *McInerney v. CareerBuilder, LLC*, 2019 WL 6497369, at *4 (N.D. Ill. Dec. 3, 2019). "Rule 12(b)(6) authorizes the dismissal of claims, not evidentiary rulings about the relevance of specific allegations set forth in a complaint," *id.*, and it "doesn't permit piecemeal dismissal of *parts* of claims." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (emphasis in original). These arguments can and should be addressed at summary judgment.

## IV. Conclusion

Circana's motion to dismiss is denied.

Enter: 24-cv-10946
Date: December 17, 2025

_____
Lindsay C. Jenkins